A BOOK NAMED "JOHN CLELAND'S MEMOIRS OF A WOMAN OF PLEASURE" ET AL. *v.* ATTORNEY GENERAL OF MASSACHUSETTS.

No. 368.   Argued December 7–8, 1965.—Decided March 21, 1966.

414

*Charles Rembar* argued the cause and filed briefs for appellants.

*William I. Cowin,* Assistant Attorney General of Massachusetts, argued the cause for appellee. With him on the brief were *Edward W. Brooke,* Attorney General, and *John E. Sullivan,* Assistant Attorney General.

*Charles H. Keating, Jr.,* and *James J. Clancy* filed a brief for Citizens for Decent Literature, Inc., et al., as *amici curiae,* urging affirmance.

MR. JUSTICE BRENNAN announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE and MR. JUSTICE FORTAS join.

This is an obscenity case in which *Memoirs of a Woman of Pleasure* (commonly known as *Fanny Hill*), written by John Cleland in about 1750, was adjudged obscene in a proceeding that put on trial the book itself, and not its publisher or distributor. The proceeding was a civil equity suit brought by the Attorney General of Massachusetts, pursuant to General Laws of Massachusetts, Chapter 272, §§ 28C–28H, to have the book declared obscene.[1] Section 28C requires that the petition commencing the suit be "directed against [the] book by name" and that an order to show cause "why said book should not be judicially determined to be obscene" be published in a daily newspaper and sent by registered mail "to all persons interested in the publication." Publication of the order in this case occurred in a Boston daily newspaper, and a copy of the order was sent by registered mail to G. P. Putnam's Sons, alleged to be the publisher and copyright holder of the book.

As authorized by § 28D, G. P. Putnam's Sons intervened in the proceedings in behalf of the book, but it did not claim the right provided by that section to have the issue of obscenity tried by a jury. At the hearing before a justice of the Superior Court, which was conducted, under § 28F, "in accordance with the usual course of proceedings in equity," the court received the book in evidence and also, as allowed by the section, heard the testimony of experts [2] and accepted other evidence, such

---

[1] The text of the statute appears in the Appendix.

[2] In dissenting from the Supreme Judicial Court's disposition in this case, 349 Mass. 69, 74–75, 206 N. E. 2d 403, 406–407 (1965), Justice Whittemore summarized this testimony:

"In the view of one or another or all of the following viz., the chairman of the English department at Williams College, a professor of English at Harvard College, an associate professor of English literature at Boston University, an associate professor of English at Massachusetts Institute of Technology, and an assistant

as book reviews, in order to assess the literary, cultural, or educational character of the book. This constituted the entire evidence, as neither side availed itself of the

professor of English and American literature at Brandeis University, the book is a minor 'work of art' having 'literary merit' and 'historical value' and containing a good deal of 'deliberate, calculated comedy.' It is a piece of 'social history of interest to anyone who is interested in fiction as a way of understanding society in the past.'[1] A saving grace is that although many scenes, if translated

"[1] One of the witnesses testified in part as follows: 'Cleland is part of what I should call this cultural battle that is going on in the 18th century, a battle between a restricted Puritan, moralistic ethic that attempts to suppress freedom of the spirit, freedom of the flesh, and this element is competing with a freer attitude towards life, a more generous attitude towards life, a more wholesome attitude towards life, and this very attitude that is manifested in Fielding's great novel "Tom Jones" is also evident in Cleland's novel. . . . [Richardson's] "Pamela" is the story of a young country girl; [his] "Clarissa" is the story of a woman trapped in a house of prostitution. Obviously, then Cleland takes both these themes, the country girl, her initiation into life and into experience, and the story of a woman in a house of prostitution, and what he simply does is to take the situation and reverse the moral standards. Richardson believed that chastity was the most important thing in the world; Cleland and Fielding obviously did not and thought there were more important significant moral values.' "

into the present day language of 'the realistic, naturalistic novel, could be quite offensive' these scenes are not described in such language. The book contains no dirty words and its language 'functions . . . to create a distance, even when the sexual experiences are portrayed.' The response, therefore, is a literary response. The descriptions of depravity are not obscene because 'they are subordinate to an interest which is primarily literary'; Fanny's reaction to the scenes of depravity was 'anger,' 'disgust, horror, [and] indignation.' The book 'belongs to the history of English literature rather than the history of smut.'[2] "

"[2] In the opinion of the other academic witness, the headmaster of a private school, whose field is English literature, the book is without literary merit and is obscene, impure, hard core pornography, and is patently offensive."

opportunity provided by the section to introduce evidence "as to the manner and form of its publication, advertisement, and distribution." [3] The trial justice entered a final decree, which adjudged *Memoirs* obscene and declared that the book "is not entitled to the protection of the First and Fourteenth Amendments to the Constitution of the United States against action by the Attorney General or other law enforcement officer pursuant to the provisions of . . . § 28B, or otherwise." [4] The Massachusetts Supreme Judicial Court affirmed the decree. 349 Mass. 69, 206 N. E. 2d 403 (1965). We noted probable jurisdiction. 382 U. S. 900. We reverse.[5]

---

[3] The record in this case is thus significantly different from the records in *Ginzburg* v. *United States, post,* p. 463, and *Mishkin* v. *New York, post,* p. 502. See pp. 420–421, *infra.*

[4] Section 28B makes it a criminal offense, *inter alia,* to import, print, publish, sell, loan, distribute, buy, procure, receive, or possess for the purpose of sale, loan, or distribution, "a book, knowing it to be obscene." Section 28H provides that in any prosecution under § 28B the decree obtained in a proceeding against the book "shall be admissible in evidence" and further that "[i]f prior to the said offence a final decree had been entered against the book, the defendant, if the book be obscene . . . shall be conclusively presumed to have known said book to be obscene . . . ." Thus a declaration of obscenity such as that obtained in this proceeding is likely to result in the total suppression of the book in the Commonwealth.

The constitutionality of § 28H has not been challenged in this appeal.

[5] Although the final decree provides no coercive relief but only a declaration of the book's obscenity, our adjudication of the merits of the issue tendered, viz., whether the state courts erred in declaring the book obscene, is not premature. There is no uncertainty as to the content of the material challenged, and the Attorney General's petition commencing this suit states that the book "is being imported, sold, loaned, or distributed in the Commonwealth." The declaration of obscenity is likely to have a serious inhibitory effect on the distribution of the book, and this probable impact is to no small measure derived from possible collateral uses of the declaration in subsequent prosecutions under the Massachusetts criminal obscenity statute. See n. 4, *supra.*

418

## I.

The term "obscene" appearing in the Massachusetts statute has been interpreted by the Supreme Judicial Court to be as expansive as the Constitution permits: the "statute covers all material that is obscene in the constitutional sense." *Attorney General* v. *The Book Named "Tropic of Cancer,"* 345 Mass. 11, 13, 184 N. E. 2d 328, 330 (1962). Indeed, the final decree before us equates the finding that *Memoirs* is obscene within the meaning of the statute with the declaration that the book is not entitled to the protection of the First Amendment.[6] Thus the sole question before the state courts was whether *Memoirs* satisfies the test of obscenity established in *Roth* v. *United States,* 354 U. S. 476.

We defined obscenity in *Roth* in the following terms: "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U. S., at 489. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.

The Supreme Judicial Court purported to apply the *Roth* definition of obscenity and held all three criteria satisfied. We need not consider the claim that the court erred in concluding that *Memoirs* satisfied the prurient

---

[6] We infer from the opinions below that the other adjectives describing the proscribed books in §§ 28C–28H, "indecent" and "impure," have either been read out of the statute or deemed synonymous with "obscene."

appeal and patent offensiveness criteria; for reversal is required because the court misinterpreted the social value criterion. The court applied the criterion in this passage:

> "It remains to consider whether the book can be said to be 'utterly without social importance.' We are mindful that there was expert testimony, much of which was strained, to the effect that Memoirs is a structural novel with literary merit; that the book displays a skill in characterization and a gift for comedy; that it plays a part in the history of the development of the English novel; and that it contains a moral, namely, that sex with love is superior to sex in a brothel. But the fact that the testimony may indicate this book has some minimal literary value does not mean it is of any social importance. We do not interpret the 'social importance' test as requiring that a book which appeals to prurient interest and is patently offensive must be unqualifiedly worthless before it can be deemed obscene." 349 Mass., at 73, 206 N. E. 2d, at 406.

The Supreme Judicial Court erred in holding that a book need not be "unqualifiedly worthless before it can be deemed obscene." A book cannot be proscribed unless it is found to be *utterly* without redeeming social value. This is so even though the book is found to possess the requisite prurient appeal and to be patently offensive. Each of the three federal constitutional criteria is to be applied independently; the social value of the book can neither be weighed against nor canceled by its prurient appeal or patent offensiveness.[7] Hence,

[7] "[M]aterial dealing with sex in a manner that advocates ideas . . . or that has literary or scientific or artistic value or any other form of social importance, may not be branded as obscenity and denied the constitutional protection. Nor may the constitutional status of the material be made to turn on a 'weighing' of its social importance against its prurient appeal, for a work cannot be pro-

even on the view of the court below that *Memoirs* possessed only a modicum of social value, its judgment must be reversed as being founded on an erroneous interpretation of a federal constitutional standard.

## II.

It does not necessarily follow from this reversal that a determination that *Memoirs* is obscene in the constitutional sense would be improper under all circumstances. On the premise, which we have no occasion to assess, that *Memoirs* has the requisite prurient appeal and is patently offensive, but has only a minimum of social value, the circumstances of production, sale, and publicity are relevant in determining whether or not the publication or distribution of the book is constitutionally protected. Evidence that the book was commercially exploited for the sake of prurient appeal, to the exclusion of all other values, might justify the conclusion that the book was utterly without redeeming social importance. It is not that in such a setting the social value test is relaxed so as to dispense with the requirement that a book be *utterly* devoid of social value, but rather that, as we elaborate in *Ginzburg* v. *United States, post,* pp. 470–473, where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, a court could accept his evaluation at its face value. In this proceeding, however, the courts were asked to judge the obscenity of *Memoirs* in the abstract, and the declaration of obscenity was neither aided nor limited by a specific set of circumstances of production, sale, and pub-

scribed unless it is 'utterly' without social importance. See *Zeitlin* v. *Arnebergh,* 59 Cal. 2d 901, 920, 383 P. 2d 152, 165, 31 Cal. Rptr. 800, 813 (1963)." *Jacobellis* v. *Ohio,* 378 U. S. 184, 191 (opinion of BRENNAN, J.). Followed in, *e. g., People* v. *Bruce,* 31 Ill. 2d 459, 461, 202 N. E. 2d 497, 498 (1964); *Trans-Lux Distributing Corp.* v. *Maryland Bd. of Censors,* 240 Md. 98, 104–105, 213 A. 2d 235, 238–239 (1965).

licity.[8] All possible uses of the book must therefore be considered, and the mere risk that the book might be exploited by panderers because it so pervasively treats sexual matters cannot alter the fact—given the view of the Massachusetts court attributing to *Memoirs* a modicum of literary and historical value—that the book will have redeeming social importance in the hands of those who publish or distribute it on the basis of that value.

*Reversed.*

MR. JUSTICE BLACK and MR. JUSTICE STEWART concur in the reversal for the reasons stated in their respective dissenting opinions in *Ginzburg* v. *United States, post,* p. 476 and p. 497, and *Mishkin* v. *New York, post,* p. 515 and p. 518.

## APPENDIX TO OPINION OF MR. JUSTICE BRENNAN.

STATE STATUTE.
MASSACHUSETTS GENERAL LAWS, CHAPTER 272.

．　　　　．　　　　．　　　　．　　　　．

SECTION 28B. Whoever imports, prints, publishes, sells, loans or distributes, or buys, procures, receives, or

---

[8] In his dissenting opinion, 349 Mass., at 76–78, 206 N. E. 2d, at 408–409, Justice Cutter stated that, although in his view the book was not "obscene" within the meaning of *Roth*, "it could reasonably be found that distribution of the book to persons under the age of eighteen would be a violation of G. L. c. 272, § 28, as tending to corrupt the morals of youth." (Section 28 makes it a crime to sell to "a person under the age of eighteen years a book . . . which is obscene . . . or manifestly tends to corrupt the morals of youth.") He concluded that the court should "limit the relief granted to a declaration that distribution of this book to persons under the age of eighteen may be found to constitute a violation of [G. L.] c. 272, § 28, if that section is reasonably applied . . . ." However, the decree was not so limited and we intimate no view concerning the constitutionality of such a limited declaration regarding *Memoirs*. Cf. *Jacobellis* v. *Ohio*, 378 U. S., at 195.

has in his possession for the purpose of sale, loan or distribution, a book, knowing it to be obscene, indecent or impure, or whoever, being a wholesale distributor, a jobber, or publisher sends or delivers to a retail storekeeper a book, pamphlet, magazine or other form of printed or written material, knowing it to be obscene, indecent or impure, which said storekeeper had not previously ordered in writing, specifying the title and quantity of such publication he desired, shall be punished by imprisonment in the state prison for not more than five years or in a jail or house of correction for not more than two and one half years, or by a fine of not less than one hundred dollars nor more than five thousand dollars, or by both such fine and imprisonment in jail or the house of correction.

SECTION 28C. Whenever there is reasonable cause to believe that a book which is being imported, sold, loaned or distributed, or is in the possession of any person who intends to import, sell, loan or distribute the same, is obscene, indecent or impure, the attorney general, or any district attorney within his district, shall bring an information or petition in equity in the superior court directed against said book by name. Upon the filing of such information or petition in equity, a justice of the superior court shall, if, upon a summary examination of the book, he is of opinion that there is reasonable cause to believe that such book is obscene, indecent or impure, issue an order of notice, returnable in or within thirty days, directed against such book by name and addressed to all persons interested in the publication, sale, loan or distribution thereof, to show cause why said book should not be judicially determined to be obscene, indecent or impure. Notice of such order shall be given by publication once each week for two successive weeks in a daily newspaper published in the city of Boston and, if such information or petition be filed in any county other than

Suffolk county, then by publication also in a daily newspaper published in such other county. A copy of such order of notice shall be sent by registered mail to the publisher of said book, to the person holding the copyrights, and to the author, in case the names of any such persons appear upon said book, fourteen days at least before the return day of such order of notice. After the issuance of an order of notice under the provisions of this section, the court shall, on motion of the attorney general or district attorney, make an interlocutory finding and adjudication that said book is obscene, indecent or impure, which finding and adjudication shall be of the same force and effect as the final finding and adjudication provided in section twenty-eight E or section twenty-eight F, but only until such final finding and adjudication is made or until further order of the court.

SECTION 28D. Any person interested in the sale, loan or distribution of said book may appear and file an answer on or before the return day named in said notice or within such further time as the court may allow, and may claim a right to trial by jury on the issue whether said book is obscene, indecent or impure.

SECTION 28E. If no person appears and answers within the time allowed, the court may at once upon motion of the petitioner, or of its own motion, no reason to the contrary appearing, order a general default and if the court finds that the book is obscene, indecent or impure, may make an adjudication against the book that the same is obscene, indecent and impure.

SECTION 28F. If an appearance is entered and answer filed, the case shall be set down for speedy hearing, but a default and order shall first be entered against all persons who have not appeared and answered, in the manner provided in section twenty-eight E. Such hearing shall be conducted in accordance with the usual course of proceedings in equity including all rights of exception and

appeal. At such hearing the court may receive the testimony of experts and may receive evidence as to the literary, cultural or educational character of said book and as to the manner and form of its publication, advertisement, and distribution. Upon such hearing, the court may make an adjudication in the manner provided in said section twenty-eight E.

SECTION 28G. An information or petition in equity under the provisions of section twenty-eight C shall not be open to objection on the ground that a mere judgment, order or decree is sought thereby and that no relief is or could be claimed thereunder on the issue of the defendant's knowledge as to the obscenity, indecency or impurity of the book.

SECTION 28H. In any trial under section twenty-eight B on an indictment found or a complaint made for any offence committed after the filing of a proceeding under section twenty-eight C, the fact of such filing and the action of the court or jury thereon, if any, shall be admissible in evidence. If prior to the said offence a final decree had been entered against the book, the defendant, if the book be obscene, indecent or impure, shall be conclusively presumed to have known said book to be obscene, indecent or impure, or if said decree had been in favor of the book he shall be conclusively presumed not to have known said book to be obscene, indecent or impure, or if no final decree had been entered but a proceeding had been filed prior to said offence, the defendant shall be conclusively presumed to have had knowledge of the contents of said book.

MR. JUSTICE DOUGLAS, concurring in the judgment.

*Memoirs of a Woman of Pleasure,* or, as it is often titled, *Fanny Hill,* concededly is an erotic novel. It was first published in about 1749 and has endured to this

date, despite periodic efforts to suppress it.[1]  The book relates the adventures of a young girl who becomes a prostitute in London.  At the end, she abandons that life and marries her first lover, observing:

> "Thus, at length, I got snug into port, where, in the bosom of virtue, I gather'd the only uncorrupt sweets: where, looking back on the course of vice I had run, and comparing its infamous blandishments with the infinitely superior joys of innocence, I could not help pitying, even in point of taste, those who, immers'd in gross sensuality, are insensible to the so delicate charms of VIRTUE, than which even PLEASURE has not a greater friend, nor than VICE a greater enemy.  Thus temperance makes men lords over those pleasures that intemperance enslaves them to: the one, parent of health, vigour, fertility, cheerfulness, and every other desirable good of life; the other, of diseases, debility, barrenness, self-loathing, with only every evil incident to human nature.
>
> ". . . The paths of Vice are sometimes strew'd with roses, but then they are for ever infamous for many a thorn, for many a cankerworm: those of Virtue are strew'd with roses purely, and those eternally unfading ones."[2]

In 1963, an American publishing house undertook the publication of *Memoirs*.  The record indicates that an unusually large number of orders were placed by universities and libraries; the Library of Congress requested the

---

[1] *Memoirs* was the subject of what is generally regarded as the first recorded suppression of a literary work in this country on grounds of obscenity.  See *Commonwealth* v. *Holmes*, 17 Mass. 336 (1821).  The edition there condemned differed from the present volume in that it contained apparently erotic illustrations.

[2] *Memoirs*, at 213–214 (Putnam ed. 1963).

right to translate the book into Braille. But the Commonwealth of Massachusetts instituted the suit that ultimately found its way here, praying that the book be declared obscene so that the citizens of Massachusetts might be spared the necessity of determining for themselves whether or not to read it.

The courts of Massachusetts found the book "obscene" and upheld its suppression. This Court reverses, the prevailing opinion having seized upon language in the opinion of the Massachusetts Supreme Judicial Court in which it is candidly admitted that *Fanny Hill* has at least "some minimal literary value." I do not believe that the Court should decide this case on so disingenuous a basis as this. I base my vote to reverse on my view that the First Amendment does not permit the censorship of expression not brigaded with illegal action. But even applying the prevailing view of the *Roth* test, reversal is compelled by this record which makes clear that *Fanny Hill* is not "obscene." The prosecution made virtually no effort to prove that this book is "utterly without redeeming social importance." The defense, on the other hand, introduced considerable and impressive testimony to the effect that this was a work of literary, historical, and social importance.[3]

---

[3] The defense drew its witnesses from the various colleges located within the Commonwealth of Massachusetts. These included: Fred Holly Stocking, Professor of English and Chairman of the English Department, Williams College; John M. Bullitt, Professor of English and Master of Quincy House, Harvard College; Robert H. Sproat, Associate Professor of English Literature, Boston University; Norman N. Holland, Associate Professor of English, Massachusetts Institute of Technology; and Ira Konigsberg, Assistant Professor of English and American Literature, Brandeis University.

In addition, the defense introduced into evidence reviews of impartial literary critics. These are, in my opinion, of particular significance since their publication indicates that the book is of sufficient significance as to warrant serious critical comment. The

We are judges, not literary experts or historians or philosophers. We are not competent to render an independent judgment as to the worth of this or any other book, except in our capacity as private citizens. I would pair my Brother CLARK on *Fanny Hill* with the Universalist minister I quote in the Appendix. If there is to be censorship, the wisdom of experts on such matters as literary merit and historical significance must be evaluated. On this record, the Court has no choice but to reverse the judgment of the Massachusetts Supreme Judicial Court, irrespective of whether we would include *Fanny Hill* in our own libraries.

Four of the seven Justices of the Massachusetts Supreme Judicial Court conclude that *Fanny Hill* is obscene. 349 Mass. 69, 206 N. E. 2d 403. Four of the seven judges of the New York Court of Appeals conclude that it is not obscene. *Larkin* v. *Putnam's Sons*, 14 N. Y. 2d 399, 200 N. E. 2d 760. To outlaw the book on such a voting record would be to let majorities rule where minorities were thought to be supreme. The Constitution forbids abridgment of "freedom of speech, or of the press." Censorship is the most notorious form of abridgment. It substitutes majority rule where minority tastes or viewpoints were to be tolerated.

It is to me inexplicable how a book that concededly has social worth can nonetheless be banned because of the manner in which it is advertised and sold. However florid its cover, whatever the pitch of its advertisements, the contents remain the same.

Every time an obscenity case is to be argued here, my office is flooded with letters and postal cards urging me

---

reviews were by V. S. Pritchett, New York Review of Books, p. 1 (Oct. 31, 1963); Brigid Brophy, New Statesman, p. 710 (Nov. 15, 1963); and J. Donald Adams, New York Times Book Review, p. 2 (July 28, 1963). And the Appendix to this opinion contains another contemporary view.

to protect the community or the Nation by striking down the publication. The messages are often identical even down to commas and semicolons. The inference is irresistible that they were all copied from a school or church blackboard. Dozens of postal cards often are mailed from the same precinct. The drives are incessant and the pressures are great. Happily we do not bow to them. I mention them only to emphasize the lack of popular understanding of our constitutional system. Publications and utterances were made immune from majoritarian control by the First Amendment, applicable to the States by reason of the Fourteenth. No exceptions were made, not even for obscenity. The Court's contrary conclusion in *Roth,* where obscenity was found to be "outside" the First Amendment, is without justification.

The extent to which the publication of "obscenity" was a crime at common law is unclear. It is generally agreed that the first reported case involving obscene conduct is *The King* v. *Sir Charles Sedley.*[4] Publication of obscene literature, at first thought to be the exclusive concern of the ecclesiastical courts,[5] was not held to constitute an indictable offense until 1727.[6] A later case involved the publication of an "obscene and

---

[4] There are two reports of the case. The first is captioned *Le Roy* v. *Sr. Charles Sidney,* 1 Sid. 168, pl. 29 (K. B. 1663); the second is titled *Sir Charles Sydlyes Case,* 1 Keble 620 (K. B. 1663). Sir Charles had made a public appearance on a London balcony while nude, intoxicated, and talkative. He delivered a lengthy speech to the assembled crowd, uttered profanity, and hurled bottles containing what was later described as an "offensive liquor" upon the crowd. The proximate source of the "offensive liquor" appears to have been Sir Charles. Alpert, Judicial Censorship of Obscene Literature, 52 Harv. L. Rev. 40–43 (1938).

[5] *The Queen* v. *Read,* 11 Mod. 142 (Q. B. 1707).

[6] *Dominus Rex* v. *Curl,* 2 Strange 789 (K. B. 1727). See Straus, The Unspeakable Curll (1927).

impious libel" (a bawdy parody of Pope's "Essay on Man") by a member of the House of Commons.[7] On the basis of these few cases, one cannot say that the common-law doctrines with regard to publication of obscenity were anything but uncertain. "There is no definition of the term. There is no basis of identification. There is no unity in describing what is obscene literature, or in prosecuting it. There is little more than the ability to smell it." Alpert, Judicial Censorship of Obscene Literature, 52 Harv. L. Rev. 40, 47 (1938).

But even if the common law had been more fully developed at the time of the adoption of the First Amendment, we would not be justified in assuming that the Amendment left the common law unscathed. In *Bridges* v. *California,* 314 U. S. 252, 264, we said:

"[T]o assume that English common law in this field became ours is to deny the generally accepted historical belief that 'one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.' Schofield, *Freedom of the Press in the United States,* 9 Publications Amer. Sociol. Soc., 67, 76.

"More specifically, it is to forget the environment in which the First Amendment was ratified. In presenting the proposals which were later embodied in the Bill of Rights, James Madison, the leader in the preparation of the First Amendment, said: 'Although I know whenever the great rights, the trial by jury, freedom of the press, or liberty of conscience, come in question in that body [Parliament],

---

[7] *Rex* v. *Wilkes,* 4 Burr. 2527 (K. B. 1770). The prosecution of Wilkes was a highly political action, for Wilkes was an outspoken critic of the government. See R. W. Postgate, That Devil Wilkes (1929). It has been suggested that the prosecution in this case was a convenient substitute for the less attractive charge of seditious libel. See Alpert, *supra,* at 45.

the invasion of them is resisted by able advocates, yet their Magna Charta does not contain any one provision for the security of those rights, respecting which the people of America are most alarmed. The freedom of the press and rights of conscience, those choicest privileges of the people, are unguarded in the British Constitution.' "

And see *Grosjean* v. *American Press Co.*, 297 U. S. 233, 248–249.

It is true, as the Court observed in *Roth,* that obscenity laws appeared on the books of a handful of States at the time the First Amendment was adopted.[8] But the First Amendment was, until the adoption of the Fourteenth, a restraint only upon federal power. Moreover, there is an absence of any *federal* cases or laws relative to obscenity in the period immediately after the adoption of the First Amendment. Congress passed no legislation relating to obscenity until the middle of the nineteenth century.[9] Neither reason nor history warrants exclusion of any particular class of expression from the protection of the First Amendment on nothing more than a judgment that it is utterly without merit. We faced the difficult questions the First Amendment poses with regard to libel in *New York Times* v. *Sullivan,*

---

[8] See 354 U. S., at 483 and n. 13. For the most part, however, the early legislation was aimed at blasphemy and profanity. See 354 U. S., at 482–483 and n. 12. The first reported decision involving the publication of obscene literature does not come until 1821. See *Commonwealth* v. *Holmes,* 17 Mass. 336. It was not until after the Civil War that state prosecutions of this sort became commonplace. See Lockhart & McClure, Literature, The Law of Obscenity, and the Constitution, 38 Minn. L. Rev. 295, 324–325 (1954).

[9] Tariff Act of 1842, c. 270, § 28, 5 Stat. 566 (prohibiting importation of obscene "prints"). Other federal legislation followed; the development of federal law is traced in Cairns, Paul, & Wishner, Sex Censorship: The Assumptions of Anti-Obscenity Laws and the Empirical Evidence, 46 Minn. L. Rev. 1009, 1010 n. 2 (1962).

376 U. S. 254, 269, where we recognized that "libel can claim no talismanic immunity from constitutional limitations." We ought not to permit fictionalized assertions of constitutional history to obscure those questions here. Were the Court to undertake that inquiry, it would be unable, in my opinion, to escape the conclusion that no interest of society with regard to suppression of "obscene" literature could override the First Amendment to justify censorship.

The censor is always quick to justify his function in terms that are protective of society. But the First Amendment, written in terms that are absolute, deprives the States of any power to pass on the value, the propriety, or the morality of a particular expression. Cf. *Kingsley Int'l Pictures Corp.* v. *Regents,* 360 U. S. 684, 688–689; *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495. Perhaps the most frequently assigned justification for censorship is the belief that erotica produce antisocial sexual conduct. But that relationship has yet to be proven.[10] Indeed, if one were to make judgments on the

---

[10] See Cairns, Paul & Wishner, *supra,* 1034–1041; Lockhart & McClure, *supra,* at 382–387. And see the summary of Dr. Jahoda's studies prepared by her for Judge Frank, reprinted in *United States* v. *Roth,* 237 F. 2d 796, 815–816 (concurring opinion). Those who are concerned about children and erotic literature would do well to consider the counsel of Judge Bok:

"It will be asked whether one would care to have one's young daughter read these books. I suppose that by the time she is old enough to wish to read them she will have learned the biologic facts of life and the words that go with them. There is something seriously wrong at home if those facts have not been met and faced and sorted by then; it is not children so much as parents that should receive our concern about this. I should prefer that my own three daughters meet the facts of life and the literature of the world in my library than behind a neighbor's barn, for I can face the adversary there directly. If the young ladies are appalled by what they read, they can close the book at the bottom of page one; if they read further, they will learn what is in the world and in its

basis of speculation, one might guess that literature of the most pornographic sort would, in many cases, provide a substitute—not a stimulus—for antisocial sexual conduct. See Murphy, The Value of Pornography, 10 Wayne L. Rev. 655, 661 and n. 19 (1964). As I read the First Amendment, judges cannot gear the literary diet of an entire nation to whatever tepid stuff is incapable of triggering the most demented mind. The First Amendment demands more than a horrible example or two of the perpetrator of a crime of sexual violence, in whose pocket is found a pornographic book, before it allows the Nation to be saddled with a regime of censorship.[11]

---

people, and no parents who have been discerning with their children need fear the outcome. Nor can they hold it back, for life is a series of little battles and minor issues, and the burden of choice is on us all, every day, young and old." *Commonwealth* v. *Gordon*, 66 Pa. D. & C. 101, 110.

[11] It would be a futile effort even for a censor to attempt to remove all that might possibly stimulate antisocial sexual conduct:

"The majority [of individuals], needless to say, are somewhere between the over-scrupulous extremes of excitement and frigidity . . . . Within this variety, it is impossible to define 'hard-core' pornography, as if there were some singly lewd concept from which all profane ideas passed by imperceptible degrees into that sexuality called holy. But there is no 'hard-core.' Everything, every idea, is capable of being obscene if the personality perceiving it so apprehends it.

"It is for this reason that books, pictures, charades, ritual, the spoken word, *can* and *do* lead directly to conduct harmful to the self indulging in it and to others. Heinrich Pommerenke, who was a rapist, abuser, and mass slayer of women in Germany, was prompted to his series of ghastly deeds by Cecil B. DeMille's *The Ten Commandments*. During the scene of the Jewish women dancing about the Golden Calf, all the doubts of his life came clear: Women were the source of the world's trouble and it was his mission to both punish them for this and to execute them. Leaving the theater, he slew his first victim in a park nearby. John George Haigh, the British vampire who sucked his victims' blood through soda straws and dissolved

Whatever may be the reach of the power to regulate *conduct,* I stand by my view in *Roth* v. *United States, supra,* that the First Amendment leaves no power in government over *expression of ideas.*

## APPENDIX TO OPINION OF MR. JUSTICE DOUGLAS, CONCURRING.

### DR. PEALE AND FANNY HILL.

An Address by
Rev. John R. Graham, First Universalist Church of Denver.

December 1965.

.　　　.　　　.　　　.　　　.

At the present point in the twentieth century, it seems to me that there are two books which symbolize the human quest for what is moral. *Sin, Sex and Self-Control* by Dr. Norman Vincent Peale, the well-known clergyman of New York City, portrays the struggle of contemporary middle-class society to arrive at a means of stabilizing behavior patterns. At the same time, there is a disturbing book being sold in the same stores with Dr. Peale's volume. It is a seventeenth century English novel by John Cleland and it is known as *Fanny Hill: The Memoirs of a Woman of Pleasure.*

Quickly, it must be admitted that it appears that the two books have very little in common. One was written in a day of scientific and technological sophistication, while the other is over two hundred years old. One is acclaimed in the pulpit, while the other is protested before the United States Supreme Court. *Sin, Sex and Self-Control* is authored by a Christian pastor, while

their drained bodies in acid baths, first had his murder-inciting dreams and vampire-longings from watching the 'voluptuous' procedure of—an Anglican High Church Service!" Murphy, *supra,* at 668.

*Fanny Hill* represents thoughts and experiences of a common prostitute. As far as the general public seems to be concerned, one is moral and the other is hopelessly immoral. While Dr. Peale is attempting to redeem the society, most people believe that *Fanny Hill* can only serve as another instance in an overall trend toward an immoral social order. Most parents would be pleased to find their children reading a book by Dr. Peale, but I am afraid that the same parents would be sorely distressed to discover a copy of *Fanny Hill* among the school books of their offspring.

Although one would not expect to find very many similarities between the thoughts of a pastor and those of a prostitute, the subject matter of the two books is, in many ways, strangely similar. While the contents are radically different, the concerns are the same. Both authors deal with human experience. They are concerned with people and what happens to them in the world in which they live each day. But most significantly of all, both books deal with the age-old question of "What is moral?" I readily admit that this concern with the moral is more obvious in Dr. Peale's book than it is in the one by John Cleland. The search for the moral in *Fanny Hill* is clothed in erotic passages which seem to equate morality with debauchery as far as the general public is concerned. At the same time, Dr. Peale's book is punctuated with such noble terms as "truth," "love," and "honesty."

These two books are not very important in themselves. They may or may not be great literature. Whether they will survive through the centuries to come is a question, although John Cleland has an historical edge on Norman Vincent Peale! However, in a symbolic way they do represent the struggle of the moral quest and for this reason they are important.

Dr. Peale begins his book with an analysis of contemporary society in terms of the moral disorder which is more than obvious today. He readily admits that the traditional Judeo-Christian standards of conduct and behavior no longer serve as strong and forceful guides. He writes:

> "For more than forty years, ever since my ordination, I had been preaching that if a person would surrender to Jesus Christ and adopt strong affirmative attitudes toward life he would be able to live abundantly and triumphantly. I was still absolutely convinced that this was true. But I was also bleakly aware that the whole trend in the seventh decade of the twentieth century seemed to be away from the principles and practices of religion—not toward them." (Page 1.)

Dr. Peale then reflects on the various changes that have taken place in our day and suggests that although he is less than enthusiastic about the loss of allegiance to religion, he is, nevertheless, willing to recognize that one cannot live by illusion.

After much struggle, Dr. Peale then says that he was able to develop a new perspective on the current moral dilemma of our times. What first appeared to be disaster was really opportunity. Such an idea, coming from him, should not be very surprising, since he is more or less devoted to the concept of "positive thinking!" He concludes that our society should welcome the fact that the old external authorities have fallen. He does not believe that individuals should ever be coerced into certain patterns of behavior.

According to Dr. Peale, we live in a day of challenge. Our society has longed for a time when individuals would be disciplined by self-control, rather than being motivated by external compunction. Bravely and forth-

rightly, he announces that the time has now come when self-control can and must replace external authority. He is quick to add that the values contained in the Judeo-Christian tradition and "the American way of life" must never be abandoned for they emanate from the wellsprings of "Truth." What has previously been only an external force must now be internalized by individuals.

In many ways, Dr. Peale's analysis of the social situation and the solution he offers for assisting the individual to stand against the pressures of the times, come very close to the views of Sigmund Freud. He felt that society could and would corrupt the individual and, as a result, the only sure defense was a strong super-ego or conscience. This is precisely what Dr. Peale recommends.

Interestingly enough John Cleland, in *Fanny Hill,* is concerned with the same issues. Although the question of moral behavior is presented more subtly in his book, the problem with which he deals is identical. There are those who contend that the book is wholly without redeeming social importance. They feel that it appeals only to prurient interests.

I firmly believe that *Fanny Hill* is a moral, rather than an immoral, piece of literature. In fact, I will go as far as to suggest that it represents a more significant view of morality than is represented by Dr. Peale's book *Sin, Sex and Self-Control.* As is Dr. Peale, Cleland is concerned with the nature of the society and the relationship of the individual to it. *Fanny Hill* appears to me to be an allegory. In the story, the immoral becomes the moral and the unethical emerges as the ethical. Nothing is more distressing than to discover that what is commonly considered to be evil may, in reality, demonstrate characteristics of love and concern.

There is real irony in the fact that Fanny Hill, a rather naive young girl who becomes a prostitute, finds warmth,

understanding and the meaning of love and faithfulness amid surroundings and situations which the society, as a whole, condemns as debased and depraved. The world outside the brothel affirms its faith in the dignity of man, but people are often treated as worthless and unimportant creatures. However, within the world of prostitution, Fanny Hill finds friendship, understanding, respect and is treated as a person of value. When her absent lover returns, she is not a lost girl of the gutter. One perceives that she is a whole and healthy person who has discovered the ability to love and be loved in a brothel.

I think Cleland is suggesting that one must be cautious about what is condemned and what is held in honor. From Dr. Peale's viewpoint, the story of Fanny Hill is a tragedy because she did not demonstrate self-control. She refused to internalize the values inherent in the Judeo-Christian tradition and the catalog of sexual scenes in the book, fifty-two in all, are a symbol of the debased individual and the society in which he lives.

Dr. Peale and others, would be correct in saying that Fanny Hill did not demonstrate self-control. She did, however, come to appreciate the value of self-expression. At no time were her "clients" looked upon as a means to an end. She tried and did understand them and she was concerned about them as persons. When her lover, Charles, returned she was not filled with guilt and remorse. She accepted herself as she was and was able to offer him her love and devotion.

I have a feeling that many people fear the book *Fanny Hill*, not because of its sexual scenes, but because the author raises serious question with the issue of what is moral and what is immoral. He takes exception to the idea that repression and restraint create moral individuals. He develops the thought that self-expression is more human than self-control. And he dares to suggest that, in a situation which society calls immoral and

438

debased, a genuine love and respect for life and for people, as human beings, can develop. Far from glorifying vice, John Cleland points an accusing finger at the individual who is so certain as to what it means to be a moral man.

There are those who will quickly say that this "message" will be missed by the average person who reads *Fanny Hill*. But this is precisely the point. We become so accustomed to pre-judging what is ethical and what is immoral that we are unable to recognize that what we accept as good may be nothing less than evil because it harms people.

I know of no book which more beautifully describes meaningful relationships between a man and a woman than does *Fanny Hill*. In many marriages, men use a woman for sexual gratification and otherwise, as well as vice versa. But this is not the case in the story of Fanny Hill. The point is simply that there are many, many ways in which we hurt, injure and degrade people that are far worse than either being or visiting a prostitute. We do this all in the name of morality.

At the same time that Dr. Peale is concerned with sick people, John Cleland attempts to describe healthy ones. *Fanny Hill* is a more modern and certainly more valuable book than *Sin, Sex and Self-Control* because the author does not tell us how to behave, but attempts to help us understand ourselves and the nature of love and understanding in being related to other persons. Dr. Peale's writing emphasizes the most useful commodities available to man—self-centeredness and self-control. John Cleland suggests that self-understanding and self-expression may not be as popular, but they are more humane.

The "Peale approach" to life breeds contentment, for it suggests that each one of us can be certain as to what is good and true. Standards for thinking and behavior are available and all we need to do is appropriate them

for our use. In a day when life is marked by chaos and confusion, this viewpoint offers much in the way of comfort and satisfaction. There is only one trouble with it, however, and that is that it results in conformity, rigid behavior and a lack of understanding. It results in personality configurations that are marked with an intense interest in propositions about Truth and Right but, at the same time, build a wall against people. Such an attitude creates certainty, but there is little warmth. The idea develops that there are "my kind of people" and they are "right." It forces us to degrade, dismiss and ultimately attempt to destroy anyone who does not agree with us.

To be alive and sensitive to life means that we have to choose what we want. There is no possible way for a person to be a slave and free at the same time. Self-control and self-expression are at opposite ends of the continuum. As much as some persons would like to have both, it is necessary to make a choice, since restraint and openness are contradictory qualities. To internalize external values denies the possibility of self-expression. We must decide what we want, when it comes to conformity and creativity. If we want people to behave in a structured and predictable manner, then the ideal of creativity cannot have meaning.

.         .         .         .         .

Long ago Plato said, "What is honored in a country will be cultivated there." More and more, we reward people for thinking alike and as a result, we become frightened, beyond belief, of those who take exception to the current consensus. If our society collapses, it will not be because people read a book such as *Fanny Hill.* It will fall, because we will have refused to understand it. Decadence, in a nation or an individual, arises not because there is a lack of ability to distingush between morality and immorality, but because the opportunity

for self-expression has been so controlled or strangled that the society or the person becomes a robot.

The issue which a Dr. Peale will never understand, because he is a victim of it himself and which John Cleland describes with brilliant clarity and sensitive persuasion is that until we learn to respect ourselves enough that we leave each other alone, we cannot discover the meaning of morality.

Dr. Peale and Fanny Hill offer the two basic choices open to man. Man is free to choose an autocentric existence which is marked by freedom from ambiguity and responsibility. Autocentricity presupposes a "closed world" where life is predetermined and animal-like. In contrast to this view, there is the allocentric outlook which is marked by an "open encounter of the total person with the world." Growth, spontaneity and expression are the goals of such an existence.

Dr. Peale epitomizes the autocentric approach. He offers "warm blankets" and comfortable "cocoons" for those who want to lose their humanity. On the other hand, *Fanny Hill* represents the allocentric viewpoint which posits the possibility for man to raise his sights, stretch his imagination, cultivate his sensitiveness as well as deepen and broaden his perspectives. In discussing the autocentric idea, Floyd W. Matson writes,

> "Human beings conditioned to apathy and affluence may well prefer this regressive path of least resistance, with its promise of escape from freedom and an end to striving. But we know at least that it is open to them to choose otherwise: in a word, to *choose themselves.*" (*The Broken Image,* page 193.)

In a day when people are overly sensitive in drawing lines between the good and the bad, the right and the wrong, as well as the true and the false, it seems to me

that there is great irony in the availability of a book such as *Fanny Hill.* Prostitution may be the oldest profession in the world, but we are ever faced with a question which is becoming more and more disturbing: "What does a prostitute look like?"

MR. JUSTICE CLARK, dissenting.

It is with regret that I write this dissenting opinion. However, the public should know of the continuous flow of pornographic material reaching this Court and the increasing problem States have in controlling it. *Memoirs of a Woman of Pleasure,* the book involved here, is typical. I have "stomached" past cases for almost 10 years without much outcry. Though I am not known to be a purist—or a shrinking violet—this book is too much even for me. It is important that the Court has refused to declare it obscene and thus affords it further circulation. In order to give my remarks the proper setting I have been obliged to portray the book's contents, which causes me embarrassment. However, quotations from typical episodes would so debase our Reports that I will not follow that course.

## I.

Let me first pinpoint the effect of today's holding in the obscenity field. While there is no majority opinion in this case, there are three Justices who import a new test into that laid down in *Roth* v. *United States,* 354 U. S. 476 (1957), namely, that "[a] book cannot be proscribed unless it is found to be *utterly* without redeeming social value." I agree with my Brother WHITE that such a condition rejects the basic holding of *Roth* and gives the smut artist free rein to carry on his dirty business. My vote in that case—which was the deciding one for the majority opinion—was cast solely because the Court declared the test of obscenity to be: "whether to

the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." I understood that test to include only two constitutional requirements: (1) the book must be judged as a whole, not by its parts; and (2) it must be judged in terms of its appeal to the prurient interest of the average person, applying contemporary community standards.[1] Indeed, obscenity was denoted in *Roth* as having *"such slight social value as a step to truth that any benefit that may be derived . . . is clearly outweighed by the social interest in order and morality. . . ."* At 485 (quoting *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572 (1942)). Moreover, in no subsequent decision of this Court has any "utterly without redeeming social value" test been suggested, much less expounded. My Brother HARLAN in *Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478 (1962), made no reference whatever to such a requirement in *Roth.* Rather he interpreted *Roth* as including a test of "patent offensiveness" besides "prurient appeal." Nor did my Brother BRENNAN in his concurring opinion in *Manual Enterprises* mention any "utterly without redeeming social value" test. The first reference to such a test was made by my Brother BRENNAN in *Jacobellis* v. *Ohio,* 378 U. S. 184, 191 (1964), seven years after *Roth.* In an opinion joined only by Justice Goldberg, he there wrote: "Recognizing that the test for obscenity enunciated [in *Roth*] . . . is not perfect, we think any substitute would raise equally difficult problems, and we therefore adhere to that standard." Nevertheless, he proceeded to add:

> "We would reiterate, however, our recognition in *Roth* that obscenity is excluded from the constitutional protection only because it is 'utterly without redeeming social importance,' . . . ."

---

[1] See Lockhart & McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 53–55 (1960).

This language was then repeated in the converse to announce this *non sequitur:*

"It follows that material dealing with sex in a manner that advocates ideas . . . or that has literary or scientific or artistic value or any other form of social importance, may not be branded as obscenity and denied the constitutional protection." At 191.

Significantly no opinion in *Jacobellis,* other than that of my Brother BRENNAN, mentioned the "utterly without redeeming social importance" test which he there introduced into our many and varied previous opinions in obscenity cases. Indeed, rather than recognizing the "utterly without social importance" test, THE CHIEF JUSTICE in his dissent in *Jacobellis,* which I joined, specifically stated:

"In light of the foregoing, I would reiterate my acceptance of the rule of the *Roth* case: *Material is obscene and not constitutionally protected against regulation and proscription* if 'to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' " (Emphasis added.) At 202.

THE CHIEF JUSTICE and I further asserted that the enforcement of this rule should be committed to the state and federal courts whose judgments made pursuant to the *Roth* rule we would accept, limiting our review to a consideration of whether there is "sufficient evidence" in the record to support a finding of obscenity. At 202.

II.

Three members of the majority hold that reversal here is necessary solely because their novel "utterly without redeeming social value" test was not properly interpreted or applied by the Supreme Judicial Court of Massachu-

setts. Massachusetts now has to retry the case although the "Findings of Fact, Rulings of Law and Order for Final Decree" of the trial court specifically held that "this book is 'utterly without redeeming social importance' in the fields of art, literature, science, news or ideas of any social importance and that it is obscene, indecent and impure." I quote portions of the findings:

> "Opinions of experts are admitted in evidence to aid the Court in its understanding and comprehension of the facts, but, of course, an expert cannot usurp the function of the Court. Highly artificial, stylistic writing and an abundance of metaphorical descriptions are contained in the book but the conclusions of some experts were pretty well strained in attempting to justify its claimed literary value: such as the book preached a moral that sex with love is better than sex without love, when Fanny's description of her sexual acts, particularly with the young boy she seduced, in Fanny's judgment at least, was to the contrary. *Careful review of all the expert testimony has been made,* but, the best evidence of all, is the book itself and it plainly has no value because of ideas, news or artistic, literary or scientific attributes. . . . Nor does it have any other merit. 'This Court will not adopt a rule of law which states obscenity is suppressible but well written obscenity is not.' Mr. Justice Scileppi in *People v. Fritch,* 13 N. Y. 2d 119." (Emphasis added.) Finding 20.

None of these findings of the trial court were overturned on appeal, although the Supreme Judicial Court of Massachusetts observed in addition that "the fact that the testimony may indicate this book has some minimal literary value does not mean it is of any social importance. We do not interpret the 'social importance' test as re-

quiring that a book which appeals to prurient interest and is patently offensive must be unqualifiedly worthless before it can be deemed obscene." My Brother BRENNAN reverses on the basis of this casual statement, despite the specific findings of the trial court. Why, if the statement is erroneous, Brother BRENNAN does not affirm the holding of the trial court which beyond question is correct, one cannot tell. This course has often been followed in other cases.

In my view evidence of social importance is relevant to the determination of the ultimate question of obscenity. But social importance does not constitute a separate and distinct constitutional test. Such evidence must be considered together with evidence that the material in question appeals to prurient interest and is patently offensive. Accordingly, we must first turn to the book here under attack. I repeat that I regret having to depict the sordid episodes of this book.

### III.

*Memoirs* is nothing more than a series of minutely and vividly described sexual episodes. The book starts with Fanny Hill, a young 15-year-old girl, arriving in London to seek household work. She goes to an employment office where through happenstance she meets the mistress of a bawdy house. This takes 10 pages. The remaining 200 pages of the book detail her initiation into various sexual experiences, from a lesbian encounter with a sister prostitute to all sorts and types of sexual debauchery in bawdy houses and as the mistress of a variety of men. This is presented to the reader through an uninterrupted succession of descriptions by Fanny, either as an observer or participant, of sexual adventures so vile that one of the male expert witnesses in the case was hesitant to repeat any one of them in the courtroom.

These scenes run the gamut of possible sexual experience such as lesbianism, female masturbation, homosexuality between young boys, the destruction of a maidenhead with consequent gory descriptions, the seduction of a young virgin boy, the flagellation of male by female, and vice versa, followed by fervid sexual engagement, and other abhorrent acts, including over two dozen separate bizarre descriptions of different sexual intercourses between male and female characters. In one sequence four girls in a bawdy house are required in the presence of one another to relate the lurid details of their loss of virginity and their glorification of it. This is followed the same evening by "publick trials" in which each of the four girls engages in sexual intercourse with a different man while the others witness, with Fanny giving a detailed description of the movement and reaction of each couple.

In each of the sexual scenes the exposed bodies of the participants are described in minute and individual detail. The pubic hair is often used for a background to the most vivid and precise descriptions of the response, condition, size, shape, and color of the sexual organs before, during and after orgasms. There are some short transitory passages between the various sexual episodes, but for the most part they only set the scene and identify the participants for the next orgy, or make smutty reference and comparison to past episodes.

There can be no doubt that the whole purpose of the book is to arouse the prurient interest. Likewise the repetition of sexual episode after episode and the candor with which they are described renders the book "patently offensive." These facts weigh heavily in any appraisal of the book's claims to "redeeming social importance."

Let us now turn to evidence of the book's alleged social value. While unfortunately the State offered little tes-

timony,[2] the defense called several experts to attest that
the book has literary merit and historical value.   A care-
ful reading of testimony, however, reveals that it has no
substance.   For example, the first witness testified:

> "I think it is a work of art . . . it asks for and
> receives a literary response . . . presented in an
> orderly and organized fashion, with a fictional cen-
> tral character, and with a literary style . . . . I think
> the central character is . . . what I call an intellec-
> tual . . . someone who is extremely curious about
> life and who seeks . . . to record with accuracy the
> details of the external world, physical sensations,
> psychological responses . . . an empiricist . . . . I
> find that this tells me things . . . about the 18th
> century that I might not otherwise know."

If a book of art is one that asks for and receives a literary
response, *Memoirs* is no work of art.   The sole response
evoked by the book is sensual.   Nor does the orderly
presentation of *Memoirs* make a difference; it presents
nothing but lascivious scenes organized solely to arouse
prurient interest and produce sustained erotic tension.[3]
Certainly the book's baroque style cannot vitiate the
determination of obscenity.   From a legal standpoint, we
must remember that obscenity is no less obscene though
it be expressed in "elaborate language."   Indeed, the
more meticulous its presentation, the more it appeals to
the prurient interest.   To say that Fanny is an "intel-
lectual" is an insult to those who travel under that tag.

---

[2] In a preface to the paperbook edition, "A Note on the American
History of *Memoirs of a Woman of Pleasure,*" the publisher itself
mentions several critics who denied the book had any literary merit
and found it totally undistinguished.   These critics included Ralph
Thompson and Clifton Fadiman.   P. xviii.

[3] As one review stated: "Yet all these pangs of defloration are in
the service of erotic pleasure—Fanny's and the reader's.   Postponing
the culmination of Fanny's deflowering is equivalent to postponing
the point where the reader has a mental orgasm."

She was nothing but a harlot—a sensualist—exploiting her sexual attractions which she sold for fun, for money, for lodging and keep, for an inheritance, and finally for a husband. If she was curious about life, her curiosity extended only to the pursuit of sexual delight wherever she found it. The book describes nothing in the "external world" except bawdy houses and debaucheries. As an empiricist, Fanny confines her observations and "experiments" to sex, with primary attention to depraved, lewd, and deviant practices.

Other experts produced by the defense testified that the book emphasizes the profound "idea that a sensual passion is only truly experienced when it is associated with the emotion of love" and that the sexual relationship "can be a wholesome, healthy, experience itself," whereas in certain modern novels "the relationship between the sexes is seen as another manifestation of modern decadence, insterility or perversion." In my view this proves nothing as to social value. The state court properly gave such testimony no probative weight. A review offered by the defense noted that "where 'pornography' does not brutalize, it idealizes. The book is, in this sense, an erotic fantasy—and a male fantasy, at that, put into the mind of a woman. The male organ is phenomenal to the point of absurdity." Finally, it saw the book as "a minor fantasy, deluding as a guide to conduct, but respectful of our delight in the body . . . an interesting footnote in the history of the English novel." These unrelated assertions reveal to me nothing whatever of literary, historical, or social value. Another review called the book "a great novel . . . one which turns its convention upside down . . . ." Admittedly Cleland did not attempt "high art" because he was writing "an erotic novel. He can skip the elevation and get on with the erections." Fanny's "downfall" is seen as "one long delightful swoon into the depths of pleasurable sensa-

tion." Rather than indicating social value in the book, this evidence reveals just the contrary. Another item offered by the defense described *Memoirs* as being "widely accredited as the first deliberately dirty novel in English." However, the reviewer found Fanny to be "no common harlot. Her 'Memoirs' combine literary grace with a disarming enthusiasm for an activity which is, after all, only human. What is more, she never uses a dirty word." The short answer to such "expertise" is that none of these so-called attributes have any value to society. On the contrary, they accentuate the prurient appeal.

Another expert described the book as having "detectable literary merit" since it reflects "an effort to interpret a rather complex character . . . going through a number of very different adventures." To illustrate his assertion that the "writing is very skillfully done" this expert pointed to the description of a whore, "Phoebe, who is 'red-faced, fat and in her early 50's, who waddles into a room.' She doesn't walk in, she waddles in." Given this standard for "skillful writing," it is not suprising that he found the book to have merit.

The remaining experts testified in the same manner, claiming the book to be a "record of the historical, psychological, [and] social events of the period." One has but to read the history of the 18th century to disprove this assertion. The story depicts nothing besides the brothels that are present in metropolitan cities in every period of history. One expert noticed "in this book a tendency away from nakedness during the sexual act which I find an interesting sort of sociological observation" on tastes different from contemporary ones. As additional proof, he marvels that Fanny "refers constantly to the male sexual organ as an engine . . . which is pulling you away from the way these events would be described in the 19th or 20th century." How this adds social value to the book

450

is beyond my comprehension. It only indicates the lengths to which these experts go in their effort to give the book some semblance of value. For example, the ubiquitous descriptions of sexual acts are excused as being necessary in tracing the "moral progress" of the heroine, and the giving of a silver watch to a servant is found to be "an odd and interesting custom that I would like to know more about." This only points up the bankruptcy of *Memoirs* in both purpose and content, adequately justifying the trial court's finding that it had absolutely no social value.

It is, of course, the duty of the judge or the jury to determine the question of obscenity, viewing the book by contemporary community standards. It can accept the appraisal of experts or discount their testimony in the light of the material itself or other relevant testimony. So-called "literary obscenity," *i. e.*, the use of erotic fantasies of the hard-core type clothed in an engaging literary style has no constitutional protection. If a book deals solely with erotic material in a manner calculated to appeal to the prurient interest, it matters not that it may be expressed in beautiful prose. There are obviously dynamic connections between art and sex—the emotional, intellectual, and physical—but where the former is used solely to promote prurient appeal, it cannot claim constitutional immunity. Cleland uses this technique to promote the prurient appeal of *Memoirs*. It is true that Fanny's perverse experiences finally bring from her the observation that "the heights of [sexual] enjoyment cannot be achieved until true affection prepares the bed of passion." But this merely emphasizes that sex, wherever and however found, remains the sole theme of *Memoirs*. In my view, the book's repeated and unrelieved appeals to the prurient interest of the average person leave it utterly without redeeming social importance.

## IV.

In his separate concurrence, my Brother DOUGLAS asserts there is no proof that obscenity produces anti-social conduct. I had thought that this question was foreclosed by the determination in *Roth* that obscenity was not protected by the First Amendment. I find it necessary to comment upon Brother DOUGLAS' views, however, because of the new requirement engrafted upon *Roth* by Brother BRENNAN, *i. e.*, that material which "appeals to a prurient interest" and which is "patently offensive" may still not be suppressed unless it is "utterly without redeeming social value." The question of anti-social effect thus becomes relevant to the more limited question of social value. Brother BRENNAN indicates that the social importance criterion encompasses only such things as the artistic, literary, and historical qualities of the material. But the phrasing of the "utterly without redeeming social value" test suggests that other evidence must be considered. To say that social value may "redeem" implies that courts must balance alleged esthetic merit against the harmful consequences that may flow from pornography. Whatever the scope of the social value criterion—which need not be defined with precision here—it at least anticipates that the trier of fact will weigh evidence of the material's influence in causing deviant or criminal conduct, particularly sex crimes, as well as its effect upon the mental, moral, and physical health of the average person. Brother DOUGLAS' view as to the lack of proof in this area is not so firmly held among behavioral scientists as he would lead us to be-lieve. For this reason, I should mention that there is a division of thought on the correlation between obscenity and socially deleterious behavior.

Psychological and physiological studies clearly indicate that many persons become sexually aroused from reading

obscene material.[4] While erotic stimulation caused by pornography may be legally insignificant in itself, there are medical experts who believe that such stimulation frequently manifests itself in criminal sexual behavior or other antisocial conduct.[5] For example, Dr. George W. Henry of Cornell University has expressed the opinion that obscenity, with its exaggerated and morbid emphasis on sex, particularly abnormal and perverted practices, and its unrealistic presentation of sexual behavior and attitudes, may induce antisocial conduct by the average person.[6] A number of sociologists think that this material may have adverse effects upon individual mental health, with potentially disruptive consequences for the community.[7]

In addition, there is persuasive evidence from criminologists and police officials. Inspector Herbert Case of the Detroit Police Department contends that sex murder cases are invariably tied to some form of obscene literature.[8] And the Director of the Federal Bureau of Investigation, J. Edgar Hoover, has repeatedly emphasized that pornography is associated with an overwhelmingly large number of sex crimes. Again, while the correlation between possession of obscenity and deviant be-

---

[4] For a summary of experiments with various sexual stimuli see Cairns, Paul & Wishner, Sex Censorship: The Assumptions of Anti-Obscenity Laws and the Empirical Evidence, 46 Minn. L. Rev. 1009 (1962). The authors cite research by Kinsey disclosing that obscene literature stimulated a definite sexual response in a majority of the male and female subjects tested.

[5] E. g., Wertham, Seduction of the Innocent (1954), p. 164.

[6] Testimony before the Subcommittee of the Judiciary Committee to Investigate Juvenile Delinquency, S. Rep. No. 2381, 84th Cong., 2d Sess., pp. 8–12 (1956).

[7] Sorokin, The American Sex Revolution (1956).

[8] Testimony before the House Select Committee on Current Pornographic Materials, H. R. Rep. No. 2510, 82d Cong., 2d Sess., p. 62 (1952).

havior has not been conclusively established, the files of our law enforcement agencies contain many reports of persons who patterned their criminal conduct after behavior depicted in obscene material.[9]

The clergy are also outspoken in their belief that pornography encourages violence, degeneracy and sexual misconduct. In a speech reported by the New York Journal-American August 7, 1964, Cardinal Spellman particularly stressed the direct influence obscenity has on immature persons. These and related views have been confirmed by practical experience. After years of service with the West London Mission, Rev. Donald Soper found that pornography was a primary cause of prostitution. Rolph, Does Pornography Matter? (1961), pp. 47–48.[10]

Congress and the legislatures of every State have enacted measures to restrict the distribution of erotic and pornographic material,[11] justifying these controls by reference to evidence that antisocial behavior may result in part from reading obscenity.[12] Likewise, upon another trial, the parties may offer this sort of evidence along with other "social value" characteristics that they attribute to the book.

---

[9] See, e. g., Hoover, Combating Merchants of Filth: The Role of the FBI, 25 U. Pitt. L. Rev. 469 (1964); Hoover, The Fight Against Filth, The American Legion Magazine (May 1961).

[10] For a general discussion see Murphy, Censorship: Government and Obscenity (1963), pp. 131–151.

[11] The statutes are compiled in S. Rep. No. 2381, 84th Cong., 2d Sess., pp. 17–23 (1956). While New Mexico itself does not prohibit the distribution of obscenity, it has a statute giving municipalities the right to suppress "obscene" publications. N. M. Stat. § 14–17–14 (1965 Supp.).

[12] See Report of the New York State Joint Legislative Committee Studying the Publication and Dissemination of Offensive and Obscene Material (1958), pp. 141–166.

But this is not all that Massachusetts courts might consider. I believe it can be established that the book "was commercially exploited for the sake of prurient appeal, to the exclusion of all other values" and should therefore be declared obscene under the test of commercial exploitation announced today in *Ginzburg* and *Mishkin*.

As I have stated, my study of *Memoirs* leads me to think that it has no conceivable "social importance." The author's obsession with sex, his minute descriptions of phalli, and his repetitious accounts of bawdy sexual experiences and deviant sexual behavior indicate the book was designed solely to appeal to prurient interests. In addition, the record before the Court contains extrinsic evidence tending to show that the publisher was fully aware that the book attracted readers desirous of vicarious sexual pleasure, and sought to profit solely from its prurient appeal. The publisher's "Introduction" recites that Cleland, a "never-do-well bohemian," wrote the book in 1749 to make a quick 20 guineas. Thereafter, various publications of the book, often "embellished with fresh inflammatory details" and "highly exaggerated illustrations," appeared in "surreptitious circulation." Indeed, the cover of *Memoirs* tempts the reader with the announcement that the sale of the book has finally been permitted "after 214 years of suppression." Although written in a sophisticated tone, the "Introduction" repeatedly informs the reader that he may expect graphic descriptions of genitals and sexual exploits. For instance, it states:

> "Here and there, Cleland's descriptions of lovemaking are marred by what perhaps could be best described as his adherence to the 'longitudinal fallacy'—the formidable bodily equipment of his most

accomplished lovers is apt to be described with quite unnecessary relish . . . ."

Many other passages in the "Introduction" similarly reflect the publisher's "own evaluation" of the book's nature. The excerpt printed on the jacket of the hardcover edition is typical:

> "*Memoirs of a Woman of Pleasure* is the product of a luxurious and licentious, but not a commercially degraded, era. . . . For all its abounding improprieties, his priapic novel is not a vulgar book. It treats of pleasure as the aim and end of existence, and of sexual satisfaction as the epitome of pleasure, but does so in a style that, despite its inflammatory subject, never stoops to a gross or unbecoming word."

Cleland apparently wrote only one other book, a sequel called *Memoirs of a Coxcomb,* published by Lancer Books, Inc. The "Introduction" to that book labels *Memoirs of a Woman of Pleasure* as "the most sensational piece of erotica in English literature." I daresay that this fact alone explains why G. P. Putnam's Sons published this obscenity—preying upon prurient and carnal proclivities for its own pecuniary advantage. I would affirm the judgment.

Mr. Justice Harlan, dissenting.

The central development that emerges from the aftermath of *Roth* v. *United States,* 354 U. S. 476, is that no stable approach to the obscenity problem has yet been devised by this Court. Two Justices believe that the First and Fourteenth Amendments absolutely protect obscene and nonobscene material alike. Another Justice believes that neither the States nor the Federal Government may suppress any material save for "hard-core pornography." *Roth* in 1957 stressed prurience and

utter lack of redeeming social importance;[1] as *Roth* has been expounded in this case, in *Ginzburg* v. *United States, post,* p. 463, and in *Mishkin* v. *New York, post,* p. 502, it has undergone significant transformation. The concept of "pandering," emphasized by the separate opinion of THE CHIEF JUSTICE in *Roth,* now emerges as an uncertain gloss or interpretive aid, and the further requisite of "patent offensiveness" has been made explicit as a result of intervening decisions. Given this tangled state of affairs, I feel free to adhere to the principles first set forth in my separate opinion in *Roth,* 354 U. S., at 496, which I continue to believe represent the soundest constitutional solution to this intractable problem.

My premise is that in the area of obscenity the Constitution does not bind the States and the Federal Government in precisely the same fashion. This approach is plainly consistent with the language of the First and Fourteenth Amendments and, in my opinion, more responsive to the proper functioning of a federal system of government in this area. See my opinion in *Roth,* 354 U. S., at 505–506. I believe it is also consistent with past decisions of this Court. Although some 40 years have passed since the Court first indicated that the Fourteenth Amendment protects "free speech," see *Gitlow* v. *New York,* 268 U. S. 652; *Fiske* v. *Kansas,* 274 U. S. 380, the decisions have never declared that every utterance the Federal Government may not reach or every regulatory scheme it may not enact is also beyond the power of the State. The very criteria used in opinions to delimit the protection of free speech—the gravity of the evil being regulated, see *Schneider* v. *State,* 308 U. S. 147; how "clear and present" is the danger, *Schenck* v.

---

[1] Given my view of the applicable constitutional standards, I find no occasion to consider the place of "redeeming social importance" in the majority opinion in *Roth,* an issue which further divides the present Court.

*United States,* 249 U. S. 47, 52 (Holmes, J.); the magnitude of "such invasion of free speech as is necessary to avoid the danger," *United States* v. *Dennis,* 183 F. 2d 201, 212 (L. Hand, J.)—may and do depend on the particular context in which power is exercised. When, for example, the Court in *Beauharnais* v. *Illinois,* 343 U. S. 250, upheld a criminal group-libel law because of the "social interest in order and morality," 343 U. S., at 257, it was acknowledging the responsibility and capacity of the States in such public-welfare matters and not committing itself to uphold any similar federal statute applying to such communications as Congress might otherwise regulate under the commerce power. See also *Kovacs* v. *Cooper,* 336 U. S. 77.

Federal suppression of allegedly obscene matter should, in my view, be constitutionally limited to that often described as "hard-core pornography." To be sure, that rubric is not a self-executing standard, but it does describe something that most judges and others will "know . . . when [they] see it" (STEWART, J., in *Jacobellis* v. *Ohio,* 378 U. S. 184, 197) and that leaves the smallest room for disagreement between those of varying tastes. To me it is plain, for instance, that *Fanny Hill* does not fall within this class and could not be barred from the federal mails. If further articulation is meaningful, I would characterize as "hard-core" that prurient material that is patently offensive or whose indecency is self-demonstrating and I would describe it substantially as does MR. JUSTICE STEWART's opinion in *Ginzburg, post,* p. 499. The Federal Government may be conceded a limited interest in excluding from the mails such gross pornography, almost universally condemned in this country.[2] But I believe the dangers of national

---

[2] This interest may be viewed from different angles. Compelling the Post Office to aid actively in disseminating this most obnoxious material may simply appear too offensive in itself. Or,

censorship and the existence of primary responsibility at the state level amply justify drawing the line at this point.

State obscenity laws present problems of quite a different order. The varying conditions across the country, the range of views on the need and reasons for curbing obscenity, and the traditions of local self-government in matters of public welfare all favor a far more flexible attitude in defining the bounds for the States. From my standpoint, the Fourteenth Amendment requires of a State only that it apply criteria rationally related to the accepted notion of obscenity and that it reach results not wholly out of step with current American standards. As to criteria, it should be adequate if the court or jury considers such elements as offensiveness, pruriency, social value, and the like. The latitude which I believe the States deserve cautions against any federally imposed formula listing the exclusive ingredients of obscenity and fixing their proportions. This approach concededly lacks precision, but imprecision is characteristic of mediating constitutional standards; [3] voluntariness of a confession, clear and present danger, and probable cause are only the most ready illustrations. In time and with more litigated examples, predictability increases, but there is no shortcut to satisfactory solutions in this field, and there is no advantage in supposing otherwise.

I believe the tests set out in the prevailing opinion, judged by their application in this case, offer only an

more concretely, use of the mails may facilitate or insulate distribution so greatly that federal inaction amounts to thwarting state regulation.

[3] The deterrent effect of vagueness for that critical class of books near the law's borderline could in the past be ameliorated by devices like the Massachusetts *in rem* procedure used in this case. Of course, the Court's newly adopted "panderer" test, turning as it does on the motives and actions of the particular defendant, seriously undercuts the effort to give any seller a yes or no answer on a book in advance of his own criminal prosecution.

illusion of certainty and risk confusion and prejudice. The opinion declares that a book cannot be banned unless it is "utterly without redeeming social value" (*ante*, p. 418). To establish social value in the present case, a number of acknowledged experts in the field of literature testified that *Fanny Hill* held a respectable place in serious writing, and unless such largely uncontradicted testimony is accepted as decisive it is very hard to see that the "utterly without redeeming social value" test has any meaning at all. Yet the prevailing opinion, while denying that social value may be "weighed against" or "canceled by" prurience or offensiveness (*ante*, p. 419), terminates this case unwilling to give a conclusive decision on the status of *Fanny Hill* under the Constitution.[4] Apparently, the Court believes that the social value of the book may be negated if proof of pandering is present. Using this inherently vague "pandering" notion to offset "social value" wipes out any certainty the latter term might be given by reliance on experts, and admits into the case highly prejudicial evidence without appropriate restrictions. See my dissenting opinion in *Ginzburg, post,* p. 493. I think it more satisfactory to acknowledge that on this record the book has been shown to have some quantum of social value, that it may at the same time be deemed offensive and salacious, and that the State's decision to weigh these elements and to ban this particular work does not exceed constitutional limits.

A final aspect of the obscenity problem is the role this Court is to play in administering its standards, a matter

---

[4] As I understand the prevailing opinion, its rationale is that the state court may not condemn *Fanny Hill* as obscene after finding the book to have a modicum of social value; the opinion does note that proof of pandering "might justify the conclusion" that the book wholly lacks social value (*ante,* p. 420). Given its premise for reversal, the opinion has "no occasion to assess" for itself the pruriency, offensiveness, or lack of social value of the book (*ante,* p. 420).

that engendered justified concern at the oral argument of the cases now decided. Short of saying that no material relating to sex may be banned, or that all of it may be, I do not see how this Court can escape the task of reviewing obscenity decisions on a case-by-case basis. The views of literary or other experts could be made controlling, but those experts had their say in *Fanny Hill* and apparently the majority is no more willing than I to say that Massachusetts must abide by their verdict. Yet I venture to say that the Court's burden of decision would be ameliorated under the constitutional principles that I have advocated. "Hard-core pornography" for judging federal cases is one of the more tangible concepts in the field. As to the States, the due latitude my approach would leave them ensures that only the unusual case would require plenary review and correction by this Court.

There is plenty of room, I know, for disagreement in this area of constitutional law. Some will think that what I propose may encourage States to go too far in this field. Others will consider that the Court's present course unduly restricts state experimentation with the still elusive problem of obscenity. For myself, I believe it is the part of wisdom for those of us who happen currently to possess the "final word" to leave room for such experimentation, which indeed is the underlying genius of our federal system.

On the premises set forth in this opinion, supplementing what I have earlier said in my opinions in *Roth, supra, Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478, and *Jacobellis* v. *Ohio,* 378 U. S., at 203, I would affirm the judgment of the Massachusetts Supreme Judicial Court.

Mr. Justice White, dissenting.

In *Roth* v. *United States,* 354 U. S. 476, the Court held a publication to be obscene if its predominant theme

appeals to the prurient interest in a manner exceeding customary limits of candor. Material of this kind, the Court said, is "utterly without redeeming social importance" and is therefore unprotected by the First Amendment.

To say that material within the *Roth* definition of obscenity is nevertheless not obscene if it has some redeeming social value is to reject one of the basic propositions of the *Roth* case—that such material is not protected *because* it is inherently and utterly without social value.

If "social importance" is to be used as the prevailing opinion uses it today, obscene material, however far beyond customary limits of candor, is immune if it has any literary style, if it contains any historical references or language characteristic of a bygone day, or even if it is printed or bound in an interesting way. Well written, especially effective obscenity is protected; the poorly written is vulnerable. And why shouldn't the fact that some people buy and read such material prove its "social value"?

*A fortiori*, if the predominant theme of the book appeals to the prurient interest as stated in *Roth* but the book nevertheless contains here and there a passage descriptive of character, geography or architecture, the book would not be "obscene" under the social importance test. I had thought that *Roth* counseled the contrary: that the character of the book is fixed by its predominant theme and is not altered by the presence of minor themes of a different nature. The *Roth* Court's emphatic reliance on the quotation from *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, means nothing less:

> " '. . . There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. *These include*

*the lewd and obscene . . . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . .'* (Emphasis added.)" 354 U. S., at 485.

In my view, "social importance" is not an independent test of obscenity but is relevant only to determining the predominant prurient interest of the material, a determination which the court or the jury will make based on the material itself and all the evidence in the case, expert or otherwise.

Application of the *Roth* test, as I understand it, necessarily involves the exercise of judgment by legislatures, courts and juries. But this does not mean that there are no limits to what may be done in the name of *Roth*. Cf. *Jacobellis* v. *Ohio,* 378 U. S. 184. *Roth* does not mean that a legislature is free to ban books simply because they deal with sex or because they appeal to the prurient interest. Nor does it mean that if books like *Fanny Hill* are unprotected, their nonprurient appeal is necessarily lost to the world. Literary style, history, teachings about sex, character description (even of a prostitute) or moral lessons need not come wrapped in such packages. The fact that they do impeaches their claims to immunity from legislative censure.

Finally, it should be remembered that if the publication and sale of *Fanny Hill* and like books are proscribed, it is not the Constitution that imposes the ban. Censure stems from a legislative act, and legislatures are constitutionally free to embrace such books whenever they wish to do so. But if a State insists on treating *Fanny Hill* as obscene and forbidding its sale, the First Amendment does not prevent it from doing so.

I would affirm the judgment below.