Robert G. BARROWS, Plaintiff,

v.

Thomas REDDIN, etc., et al., Defendants.

Civ. No. 68-129.

United States District Court
C. D. California.

Aug. 6, 1968.

Dissenting Opinion Aug. 19, 1968.

Stanley Fleishman, Hollywood, Cal., A. L. Wirin, Los Angeles, Cal., for plaintiffs.

Roger Arnebergh, City Atty., John A. Daly, Asst. City Atty., Los Angeles, Cal., for defendants.

Before BARNES, Circuit Judge, and CURTIS and FERGUSON, District Judges.

## MEMORANDUM OPINION

PER CURIAM.

The plaintiff is the producer of a play called "The Beard", which at the time this action was commenced was playing in Hollywood, despite the fact that a city permit required by the provisions of § 103.114 of the Los Angeles Municipal Code had been denied. The police undertook to stop the play by making nightly arrests of the plaintiff and the two actors in the play, charging them with violation of the Municipal Code and also California Penal Code, § 647(a) (making lewd and dissolute conduct a misdemeanor) and § 311.6 (making the speaking of obscene words in a public place a misdemeanor).

Plaintiff brings this action seeking a judgment declaring that these provisions of the Municipal Code and the California Penal Code are unconstitutional in that they violate the guarantees of the First and Fourteenth Amendments, and also seeking an injunction against their enforcement. Plaintiff made an application for a preliminary injunction and for an empaneling of a statutory three judge court. Plaintiff's request for a temporary restraining order during the empaneling of the three judge court was denied, but, the district court did subsequently restrain the police from making further arrests and from demanding further bail pending a determination of plaintiff's application for a preliminary injunction by this panel. A three judge court was then constituted before which plaintiff's motion for preliminary injunction was heard, this being the only matter before us.

It now appears that, subsequent to the filing of this action, a state court has declared the provisions of the Los Angeles Municipal Code invalid as applied to the plaintiff here and that all efforts on the part of the defendants to enforce the ordinance as against the plaintiff have been abandoned. We therefore consider the question of the constitutionality of the city ordinance moot, and we do not here consider it.

This leaves for our determination the validity of §§ 647(a) and 311.6 of the California Penal Code in the light of the constitutional guarantees set forth in the First and Fourteenth Amendments.

Section 647(a) makes lewd and dissolute conduct in a public place a misdemeanor.[1] Defendants contend that this section applies to lewd conduct whether it occurs on the street or upon the stage in the theater and that since the conduct alleged to be lewd did occur upon the stage in this instance, an arrest under this section was proper. The plaintiff contends that, so construed, this section is overbroad, vague and ambiguous, without ascertainable standards of guilt and abridges the exercise of freedom of speech. We abstain from deciding this issue.

■■■ We believe that, under the circumstances existing here, this court should not exercise its jurisdiction to enjoin the enforcement of a state statute which has not been authoritatively construed by the state court, and which in all probability, when so construed, will be deemed inapplicable to the conduct here involved thereby mooting the constitutional issues. The relevant principles of abstention are set forth in Harrison v. N.A.A.C.P., 360 U.S. 167 at 176–177, 79 S.Ct. 1025, at 1030, 3 L.Ed.2d 1152.

This now well-established procedure [of abstention] is aimed at the avoidance of unnecessary interference by the federal courts with proper and validly administered state concerns, a course so essential to the balanced working of our federal system. To minimize the possibility of such inter-ference a "scrupulous regard for the rightful independence of state governments * * * should at all times actuate the federal courts," Matthews v. Rodgers, 284 U.S. 521, 525, 52 S.Ct. 217, 219, 76 L.Ed. 447, as their "contribution * * * in furthering the harmonious relation between state and federal authority * * *." Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 501, 61 S.Ct. 643, 645, 85 L.Ed. 971. In the service of this doctrine, which this Court has applied in many different contexts, no principle has found more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them. See, e. g., Railroad Commission of Texas v. Pullman Co., supra; City of Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355; Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101; American Federation of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873; Shipman v. DuPre, 339 U.S. 321, 70 S.Ct. 640, 94 L.Ed. 877; Albertson v. Millard, 345 U.S. 242, 73 S.Ct. 600, 97 L.Ed. 983; Government & Civic Employees Organizing Committee, C.I.O. v. Windsor, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894. This principle does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise; it serves the policy of comity inherent in the doctrine of abstention; and it spares

---

[1]. Cal.Pen.Code, § 647. Disorderly conduct
Every person who commits any of the following acts shall be guilty of disorderly conduct, a misdemeanor:
(a) Who solicits anyone to engage in or who engages in lewd or dissolute conduct in any public place or in any place open to the public or exposed to public view.
(b) Who solicits or who engages in any act of prostitution. As used in this subdivision, "prostitution" includes any lewd act between persons of the same sex for money or other consideration.
(c) Who accosts other persons in any public place or in any place open to the public for the purpose of begging or soliciting alms.
(d) Who loiters in or about any toilet open to the public for the purpose of engaging in or soliciting any lewd or lascivious or any unlawful act.
(e) Who loiters or wanders upon the streets or from place to place without apparent reason or business * * *.

the federal courts of unnecessary constitutional adjudication. See City of Chicago v. Fieldcrest Dairies, Inc., supra, at pages 172–173, 62 S.Ct. at page 988.

Justice Harlan's opinion stresses that it was not entirely clear how the Virginia courts would, in fact interpret the statutes. They might have been construed narrowly to avoid constitutional difficulties on their face, or in such manner as to be entirely inapplicable to the N.A.A.C.P. Harrison v. N.A.A.C.P., supra, at 177–178, 79 S.Ct., at 1030–1031.

Section 647(a) can, and most likely will, be construed by the California courts in such a manner as to be free from constitutional objections. Abstention in such a case is proper. Zwickler v. Koota, 389 U.S. 241 at 249, 88 S.Ct. 391, 19 L.Ed.2d 444. See also Baggett v. Bullitt, 377 U.S. 360 at 376, n. 11, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) quoting United States v. Livingston, 179 F. Supp. 9 (D.C.E.D.S.C.) aff'd 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719. Harman v. Forssenius, 380 U.S. 528 at 535, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965).

We are aware of the limitations upon the abstention doctrine invoked by Baggett v. Bullitt, supra, and Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22. Justice Brennan's majority opinion in Dombrowski, supra, suggests that abstention is improper where a statute regulating speech is not unreasonably claimed to be void on its face and where, although state construction of the statute might modify the constitutional question or make its resolution unnecessary, such construction can be definitely established only by a series of state decisions. He suggests further, however, that abstention is proper if a "readily apparent construction suggests itself as a vehicle for rehabilitating the [statute] in a single prosecution * * *." Dombrowski, supra, at 491, 85 S.Ct., at 1123.

In the case before us there is a strong likelihood that a single prosecution, one already commenced and now ready for trial, the very prosecution which we are being asked to enjoin, will result not only in § 647(a) being held inapplicable to plaintiffs' conduct, but also in an across the board rule being announced that § 647(a) is not applicable to plays or other conduct where such conduct is employed as a media of expression and therefore entitled to the First Amendment protections.

The reasons for the limitations upon the doctrine of abstention suggested in Dombrowski, supra, and Baggett, supra, relate essentially to the "chilling effect" upon the exercise of First Amendment rights, which resulted from the special circumstance present in each case.

Dombrowski has been construed by the Court in Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182, April 22, 1968 (in which the court held the doctrine of abstention applicable)

* * * to be a case presenting a situation of the "impropriety of [state officials] invoking the statute in bad faith to impose continuing harassment in order to discourage appellants' activities * * *." 380 U.S., at 490, 85 S.Ct., at 1123. In contrast, the District Court expressly found in this case "that there was no harassment, intimidation, or expression of these complainants in their efforts to exercise their constitutional rights, but they were arrested and they are being prosecuted in good faith for their deliberate violation of that part of the statute which denounces interference with the orderly use of courthouse facilities by all citizens alike." * * *

Any chilling effect on the picketing as a form of protest and expression that flows from good-faith enforcement of this valid statute would not, of course, constitute that enforcement an impermissible invasion of protected freedoms. * * *

As in Cameron we find that there is presently no harassment, intimidation or oppression of this complainant, nor is any likely or contemplated in his efforts to exercise his constitutional rights. He has been arrested and he is being prose-

cuted in good faith for his deliberate violation of the statute. This is, therefore, not a case in which a federal court of equity by withdrawing the determination of guilt from state courts could rightly afford petitioner any protection which he could not secure by prompt trial and appeal pursued to the Supreme Court of the United States. Douglas v. City of Jeannette, 319 U.S. 157 at 164, 63 S.Ct. 877, 87 L.Ed. 1324; Cameron v. Johnson, supra.

We have abstained from considering plaintiff's constitutional objections to § 647(a) because the very emergence of such a question depends on interpretation of the statute, which we think should be properly left to the state courts.

However, plaintiff's challenge of § 311.6 comes under a different light. Here the alleged offenses for which the plaintiff is being prosecuted clearly come within the ambit of the statute, accordingly, we think plaintiff is entitled to a ruling upon the federal questions raised by the challenge.

Section 311.6, California Penal Code, makes it a misdemeanor to sing or speak any obscene song or other words in any public place.[2]

■ Plaintiff first contends that the theater, and particularly where the audience pays to be admitted, is not a public place within the meaning of the statute. It does not appear that courts of California have had an occasion to place an interpretation upon this statute. It seems fair to assume, however, that the statute should and will be construed to apply to theater performances. A former version of section 311 clearly applied to the theater for it made specific reference to the manner in which the section was to apply to actors and actresses in performances, acts, plays, dramas, exhibitions or entertainment. In the overall revision of the section, specific reference to actors and actresses has been omitted, but there has been no indication that the Legislature intended to alter, in this regard, the scope of the statute. Moreover, the very nature of the statute by its reference to songs and ballads and its adoption of the Supreme Court's standard for obscenity suggests a desire to reach the theater, cabaret, and other entertainment spots. We conclude, therefore, that section 311.6, California Penal Code, covers theater performances.

■ Petitioner next contends that section 311.6 of California Penal Code is unconstitutionally vague and overbroad and is accordingly invalid on its face. Its definition of obscenity, however, is precisely the same as the test established in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), which was at the time the statute was drafted the most recent Supreme Court pronouncement on the question. Essentially, this still remains the test, although the Supreme Court has subsequently spoken to clarify and elaborate on what it meant in Roth v. United States, supra [see A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Com. of Massachusetts, 383 U.S. 413, 418, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966)]. It seems clear that

2. Cal.Pen.Code, Chapter 7.5 Obscene Matter [New] § 311. Definitions

As used in this chapter:

(a) "Obscene" means that to the average person, applying contemporary standards, the predominant appeal of the matter, taken as a whole, is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description or representation of such matters and is matter which is utterly without redeeming social importance.

(b) "Matter" means any book, magazine, newspaper, or other printed or written material or any picture, drawing, photograph, motion picture, or other pictorial representation or any statue or other figure, or any recording, transcription or mechanical, chemical or electrical reproduction or any other articles, equipment, machines or materials.

§ 311.6 Singing or speaking obscene song, ballad, etc., in public place

Every person who knowingly sings or speaks any obscene song, ballad, or other words, in any public place is guilty of a misdemeanor.

the California Legislature intended the word "obscene" in section 311.6 to take on the meaning accorded to it by the Consitution, as interpreted by the United States Supreme Court, and so construed the statute cannot be deemed vague, nor can it be said to be overbroad or to threaten constitutionally protected conduct because of uncertainty.

We find, therefore, that section 311.6 of the California Penal Code is constitutionally valid on its face.

 We now come to the question of whether this court, in the exercise of its equity powers, should enjoin the state from prosecuting the plaintiff under this section upon the facts now before us.

Having determined that this section is constitutional on its face, we find no "special circumstances" here which require or justify this court in going further. The same reasons which we have given for abstaining in our consideration of § 647(a) would be equally applicable here.

We find, therefore, that the plaintiff has failed to show such irreparable injury as will entitle him to an injunction enjoining his prosecution under this section of the California Penal Code.

We, therefore, conclude that plaintiff's application for preliminary injunction against further prosecution under both §§ 647(a) and 311.6 of the California Penal Code is denied.

Defense counsel will prepare the appropriate order.

## DISSENTING OPINION

FERGUSON, District Judge.

The plaintiff is the producer of a silly play named "The Beard". Previous to its Los Angeles production, it had been presented in New York and San Francisco. It consists of one act with two actors who portray Jean Harlow and Billy The Kid in a post-death setting. It is most difficult to understand because of its dullness, consisting mainly of two persons throwing verbal garbage at each other and ending with a simulated sex act.

In New York the play received extensive reviews from the critics. It has been variously described as follows:

1. "It is, I think, but think diffidently, an experimental play about sexual relationship (note here, not a sexual relationship specifically but the general condition), and although the experiment succeeds, the work itself is rather tedius."—Clive Barnes, New York Times, p. 40, col. 1, Oct. 25, 1967.

2. "A great deal of it is very funny. For example, Harlow's opening line is, 'Before you can pry any secrets from me, you must first find the real me! Which one will you pursue?' If it isn't an actual line from a Harlow film, it could easily be one. On the one hand it is meaningless and on the other it is real. It is also the kind of sex line Americans have come to believe in—as much as they have come to believe in the trueness of Jean Harlow and Billy The Kid."—Martin Gottfried, Women's Wear Daily, Oct. 25, 1967.

3. "McClure's play is part of the reappropriation of America's shining trumpery myths of popular culture, as in 'Bonnie and Clyde,' which uses the same theme of sex and death as our old movies fused them in a burning crystal. But 'The Beard' is better—it is cleaner, simpler, straighter, funnier and more violent."—Newsweek, Nov. 6, 1967.

4. "McClure is continually trying to move past psycho-sexual boundaries into realms of metaphysical and cultural-philosophical recognition."—Richard Gilman, The New Republic, Dec. 2, 1967.

However, the best non-literary critique was expressed by Cecil Smith, Drama Critic of the Los Angeles Times, when he ended his observation of "The Beard" thusly:

"It should be mentioned, I suppose, that a mob of TV newsmen and curious was jammed around the theater; you fought your way in and out. On the street outside was parked a car in

which two tiny children were locked and screaming their heads off, which I thought was much more important for police attention than anything that happened in the theater."—L. A. Times, Jan. 25, 1968.

Notwithstanding its acceptance as a legitimate theatrical presentation, even though not highly acclaimed, the police in Los Angeles, as conceded in the majority opinion, undertook to stop the play. They made nightly arrests of the plaintiff and the two actors, charging them each night with three misdemeanor violations. The arrests continued until a temporary restraining order was issued. Until that time the three had each been arrested eleven times and required to post bail in the total sum of $25,000. Convictions can result to each in jail sentences of 16½ years plus fines of $16,500.

The misdemeanor charges filed were alleged violations of (1) sections of the Los Angeles Municipal Code which require the issuance of a written permit from the Board of Police Commissioners before a theatrical play may be produced; (2) Section 647(a) of the California Penal Code prohibiting disorderly conduct; and (3) Section 311.6 of the California Penal Code prohibiting the speaking of obscene words in any public place.

The plaintiff filed his complaint seeking the intervention of a three-judge federal court to enjoin the prosecutions and further interference with the performance of the play. The case was assigned to Judge Curtis under the local rules of this Court and before the three-judge court was convened, he issued a temporary restraining order prohibiting any arrests or interference with the performance of the play.

When the three-judge court was convened, it heard argument in regard to whether or not it should issue its preliminary injunction to restrain arrests and prosecution pending trial on the merits of the complaint. The complaint was filed January 26, 1968, and to date the defendants have not as yet filed an answer.

Two events have taken place subsequent to the hearing by this court on the propriety of the preliminary injunction. First, the California Supreme Court, in Burton v. Municipal Court, 68 A.C. 720, 68 Cal.Rptr. 721, 441 P.2d 281 (1968), in a case unrelated to this proceeding, declared the permit provisions of the Los Angeles Municipal Code unconstitutional for lack of definiteness and certainty. Second, the play ceased operation by reason of financial difficulty. What the police wanted to do, stop the play, the public did. The following expression of the California Supreme Court, in People v. Noroff, 67 A.C. 814, 63 Cal.Rptr. 575, 433 P.2d 479 (1967), is most applicable in regard to "The Beard":

"The United States Supreme Court has wisely recognized that ultimately the public taste must determine that which is offensive to it and that which is not; a public taste that is sophisticated and mature will reject the offensive and the dull; it will in its own good sense discard the tawdry, and once having done so, the tawdry will disappear because its production and distribution will not be profitable. Understandably, such maturity does not come quickly or easily, and, in a time when the structures of Victorianism have been replaced by wide swings of extremism, it seems hopelessly remote.

"Yet this Court is bound, of course, by the decisions of the United States Supreme Court. That court has imposed its prohibitions only at the outer limits of the area of publication, leaving to the public the task of voluntarily casting out the offensive." 67 A.C. at 820, 63 Cal.Rptr. at 579, 433 P.2d at 483.

The arrests and the resulting publicity afforded by the news media gave "The Beard" a longer life than it deserved. The producer exploited the arrests to their commercial limit. Yet not even that was successful in stemming the final verdict by the public of totally rejecting it.

The acts of the police in trying to stop the play by making the arrests based up-

on an unconstitutional city ordinance and the unconstitutional application of two sections of the state Penal Code demand the intervention of this federal court.

Section 647(a) of the California Penal Code reads as follows:

"§ 647. *Disorderly Conduct*

"Every person who commits any of the following acts shall be guilty of disorderly conduct, a misdemeanor:

"(a) Who solicits anyone to engage in or who engages in lewd or dissolute conduct in any public place or in any place open to the public or exposed to public view."

and is the successor to former § 647.5, a vagrancy statute, making lewd and dissolute persons vagrants. It was enacted in order to avoid constitutional objections set forth in a persuasive dissent in Edelman v. California, 344 U.S. 357, 73 S.Ct. 293, 97 L.Ed. 387 (1953), and its subsections seek to prohibit objectional public conduct such as prostitution, soliciting alms, loitering about public toilets, public intoxication and peeping in windows. To use such a statute to stop the performance of a theatrical play in a theater before a paid audience violates not only the clear meaning of the statute but First Amendment constitutional principles as well.

The majority abstains from exercising its jurisdiction to enjoin the enforcement of the state statute. I respectfully conclude that the factual situation of this case and the mandate of the United States Supreme Court demand that this federal court take action.

Even should the California state courts interpret § 647(a) to be inapplicable to these facts, abstention would be improper. The controlling principle is set forth in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), which establishes that the federal courts will grant relief when "defense of the State's criminal prosecution will not assure adequate vindication" of First Amendment rights. 380 U.S. at 485–86, 85 S.Ct. at 1120.

"According to *Dombrowski*, this condition exists when the State has invoked the criminal law in *bad faith* and for the purpose of harassing and disrupting the exercise of those rights. Federal courts are available to enjoin the invocation of state criminal process when that process is abusively invoked 'without any hope of ultimate success, but only to discourage' the assertion of constitutionally protected rights. 380 U.S. at 490 [, 85 S.Ct. 1116]." Cameron v. Johnson, 390 U.S. at 623, 88 S.Ct. at 1341–1342 (1968) (dissent). (Emphasis added.)

Without conducting an evidentiary hearing to determine the motives of the State officials in applying a statute which even the majority deems to be "in all probability inapplicable" and further, without even requiring the defendants to file an answer to the complaint, the majority concludes that the State was not guilty of harassment, intimidation or oppression and that prosecution was in good faith. A fair reading of *Cameron, supra,* demands at the least an evidentiary hearing to determine State motive. Such was required in *Cameron* on remand to the District Court and it was only then that the Court could determine whether relief was proper in light of the criteria set forth in *Dombrowski, supra.* It can therefore be concluded that prior to an evidentiary hearing in a case involving the issue of bad faith prosecution of First Amendment rights tantamount to harassment, abstention is improper. No evidentiary hearing was conducted, yet the majority summarily abstains.

A second and equally persuasive reason exists to justify the conclusion that abstention is improper. The facts in *Cameron* did not involve "invoking the statute in bad faith to impose continuing harassment". In contrast, the undisputed facts here, even without the benefit of an evidentiary hearing, show conclusively, as admitted by the majority, that the police tried to stop the play. Judge Curtis was required to prohibit such police conduct by issuing a tempo-

rary restraining order before the three-judge court convened.

Third, in view of the multiple arrests made on successive nights and the excessive bail required to be posted, bad faith prosecution and harassment under a statute which almost without argument is patently inapplicable can at least be assumed. Admittedly, the erroneous application of the statute must amount to an "irreparable injury necessary to justify a disruption of orderly state proceedings". *Cameron, supra,* at 621, 88 S.Ct. at 1341. Submitting to eleven arrests and posting over $25,000 in bail as the only alternative to closing the play altogether gives rise to such an irreparable injury.

Fourth, *Cameron* involved picketing, parading and a "valid law dealing with conduct subject to regulation so as to vindicate important interests of society and * * * the fact that free speech is intermingled with such conduct does not bring it within constitutional protection". *Cameron, supra,* at 617, 88 S. Ct. at 1339. Here "The Beard" involves nothing more than a First Amendment publication, the same as a book, a movie or a speech.

Fifth, the plaintiff has been before the state courts in an effort to obtain the relief which is sought here. He petitioned for a writ of prohibition in the Superior Court of the State of California for the County of Los Angeles to stop the Municipal Court prosecutions and his petition was dismissed. In *Cameron* no such relief had been sought.

Sixth, the impact of punishment under California law is so severe that if for no other reason this court should not abstain. Pursuant to § 290 of the California Penal Code, a conviction under § 647(a) renders the convicted person a sex offender who must register with the police whenever and wherever he travels in California. To subject the producer and actors of a legitimate theatrical presentation to the possibility of having to register the rest of their lives as convicted sex criminals has such a chilling effect upon free speech and press as to make reasonable men shudder. This is the type of "irreparable injury necessary to justify a disruption of orderly state proceedings" so explicitly defined in Dombrowski v. Pfister, *supra,* 380 U.S. at 485, 85 S.Ct. at 1120.

It is clear from the above cited facts that the "special circumstances" referred to in *Cameron, supra,* and *Dombrowski, supra,* which are necessary to nonabstention, exist in the present case.

It is equally clear from the reading of § 647(a) that it was never intended to apply here. If it did, then the vagueness of it when applied to publications protected by the First Amendment must be condemned.

It is settled that books, magazines, the exhibition of motion pictures, the performance of plays and all other media of communication fall within the protection of the free speech-press provisions of the First Amendment made immune from abridgement by State action through the Fourteenth Amendment. *E. g.,* Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964); Kingsley Int'l Pictures Corp. v. Regents of University of New York, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959).

It is of no significance that expression which is protected because First Amendment rights are involved takes place commercially. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).

In the area of freedom of expression, the use of vague and ambiguous standards has been uniformly condemned as violative of the First Amendment. See, *e. g.,* Keyishian v. Board of Regents, 385 U.S. 589, 603–604, 87 S.Ct. 675, 17 L.Ed. 2d 629 (1967); N.A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed. 2d 405 (1963).

The use of § 647(a) to stop a legitimate theatrical presentation results in censorship of any and all expression which some official of government deems proscribed by the broad and vague lan-

guage of the statute. In this area it is not only that persons are faced with unascertainable standards of guilt, but that the very vagueness and ambiguity of the statute imposes a self-censorship among all persons who are justifiably uncertain as to its scope. The intolerable end result is a denial of the public's access to constitutionally protected speech and press out of fear of criminal prosecution.

In N.A.A.C.P. v. Button, *supra*, at 433, 83 S.Ct., at 338, the Court held that "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity". That required specificity is totally absent in § 647(a).

Keyishian v. Board of Regents, *supra*, at 604, 87 S.Ct., at 684, states constitutional abhorrence to this "self-imposed censorship":

"New York's complicated and intricate scheme plainly violates * * * [the specificity] standard. When one must guess what conduct or utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone * * *.' " For '[t]he threat of sanctions may deter * * * almost as potently as the actual applications of sanctions.' "

Thus, as was stated in Thornhill v. Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940):

"It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion. * * * A like threat is inherent in a penal statute, like that in question here, which does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press. The existence of such a statute, which readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, results in a continuous and per-

vasive restraint on all freedom of discussion that might reasonably be regarded as within its purview."

To permit the police to use a vagrancy statute to censor a legitimate theatrical presentation is unwarranted authorization of the most blatant violation of the plaintiff's constitutional rights.

Section 311.6 of the California Penal Code provides as follows:

"§ 311.6. *Singing or speaking obscene song, ballad, etc., in public place*

"Every person who knowingly sings or speaks any obscene song, ballad, or other words, in any public place is guilty of a misdemeanor."

The arrests of the producer and actors of a play in a theater before a paid audience under this section have several patent constitutional infirmities.

First of all, it is clear that the California Legislature never intended the section to apply to "The Beard". The section, which was amended in 1961, previously read as follows:

"§ 311. * * *

"Every person who wilfully and lewdly, either:

* * * * * *

"6. Sings or speaks any lewd or obscene song, ballad, or other words, in any public place, or in any place where there are persons present to be annoyed thereby, is guilty of a misdemeanor."

The words which were omitted in 1961 were "or in any place where there are persons present to be annoyed thereby". The obvious intent of the Legislature in eliminating such words was to narrowly define the prohibited area as a public place. The rules of statutory construction which have been previously cited in reference to First Amendment rights are applicable in defining what is meant by a public place. It is obvious by the change in wording that the Legislature did not intend it to include a theater.

Next, attention must be directed toward the word "obscene". Section 311 of the Penal Code which is quoted in the

second footnote of the majority opinion, defines "obscene" and "matter" which may be obscene. The standard definition of "obscene" established in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), is incorporated into § 311(a). Subsection (b) contains the definition of the "matter" to which "obscene" applies. A careful reading of subsection (b) makes it apparent that the Legislature did not intend the obscenity statute to apply to live plays. It is very specific in confining itself only to printed and recorded materials. The definition includes the complete spectrum of everything produced or reproduced by mechanical means and eliminates entirely plays or the mere spoken word. The Legislature simply left out live spoken words in its definition of what may be obscene.

This intention of the Legislature and how § 311.6 applies to "The Beard" is made evident as the result of activities which do not involve the parties here. While "The Beard" was being performed commercially in Los Angeles, the drama department of the California State College in Fullerton gave a presentation on campus. The immediate result of that presentation was an investigation by a State Senate Committee. The outcome of that investigation was the introduction of Senate Bill No. 487 which would add § 314.1 to the Penal Code. The new section would provide as follows:

"314.1. Every ~~student~~ *person* who engages in, and every teacher or school official who knowingly permits, procures, assists, or counsels a ~~student~~ *person* to engage in, any simulated act of sexual intercourse or deviate sexual conduct occurring during the course of a play, motion picture, television production, or other exhibition or mechanical reproduction of human conduct produced and presented under the jurisdiction, sponsorship, or control of any state college, ~~in which such student is enrolled or by which such teacher or official is employed,~~ is guilty of a misdeameanor.

"For the purposes of this section the term 'deviate sexual conduct' means any act prohibited by Section 286 or Section 288a."

The consultant to the State Senate Judiciary Committee gave a written opinion in regard to the Bill. His opinion is as follows:

"SB 487 (Walsh) Hearing Date: 4–18–68
As Introduced
Penal Code

State College Plays or Exhibitions

HISTORY

S
B
4
8
7

———◆———

"Source: The Senate Investigating Subcommittee which investigated performances of 'The Beard' at Fullerton State College during this last interim period.

"No known prior similar legislation.
purpose
"SB 487 proposes to add Pen. 314.1 to make it a misdemeanor for a student to engage in, or a teacher or a school official to knowingly permit, assist or counsel a student to engage in, *any simulated act of sexual intercourse or deviate sexual conduct* during the course of a play or other exhibition produced and presented under the sponsorship, control, etc., of any state college in which the student is enrolled or by which the teacher or official employed.

" 'Deviate sexual conduct' is defined by SB 487 for purposes of the proposed new section to mean sodomy or oral-genital activity.

"*QUERY:* Since plays come within the 'freedom of expression' encompassed in the First Amendment, this proposed prohibition will have to meet the constitutional standards appropriate thereto. Undoubtedly, this legislation would fall within the general category of regulation of obscenity. Obscenity has been declared to be an unprotected form of speech. On the other hand, 'obscene' means being 'utterly without redeeming social importance.' Query, whether the mere simulation of a particular act is utterly without redeeming social importance? Rather, *it must be looked at in the context of the entire play, etc., to determine if it is obscene.* Thus, the proposed absolute prohibition, with criminal penalties and without reference to overall context, is undoubtedly unconstitutional.

"An amendment to Pen. 311(b) might be appropriate to add 'play or exhibition' to the definition therein of matter,' so as to bring a legally obscene play within the enforcement provisions of present law."

In the context of the point that under the existing definition of "obscene", live plays are not included, the last paragraph of the consultant's opinion is especially significant. He states in effect that the entire matter could be handled by adding plays to the definition of matter under § 311(b) "so as to bring a legally obscene play within the enforcement provisions of present law". No clearer exposition can be found that under present law the California Legislature never intended § 311.6 to apply to "The Beard".

Assuming, however, that it does, § 311.6 as applied here is an unconstitutional application. To apply such a statute to isolated words excerpted or extracted from a theatrical performance out of context is to create the same overbreadth, vagueness and ambiguity which has uniformly been condemned by the United States Supreme Court. A summary of the obscenity laws is provided in the 1957 decision of Roth v. United States, *supra,* 354 U.S. at 488–489, 77 S.Ct., at 1311:

"The early leading standard of obscenity allowed material to be judged merely by the effect of an isolated excerpt upon particularly susceptible persons. Regina v. Hicklin, [1868] L. R. 3 Q.B. 360. Some American courts adopted this standard but later decisions have rejected it and substituted this test: whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest. The *Hicklin* test, judging obscenity by the effect of isolated passages upon the most susceptible persons, might well encompass material legitimately treating with sex, and so it must be rejected as unconstitutionally restrictive of the freedoms of speech and press." (Footnotes omitted.)

In A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 418, 86 S. Ct. 975, 977, 16 L.Ed.2d 1 (1966), the Court held:

"Under this definition [of obscenity], as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) *the dominant theme of the material taken as a whole* appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." (Emphasis added.)

It is clear that no expression can be deemed obscene unless the dominant theme of the material "taken as a whole" exceeds contemporary community standards, appeals to prurient interest and is utterly without social importance. It is therefore unconstitutional for a statute to punish as obscene isolated words extracted from the performance of a play.

Yet, that is the exact intent of § 311.6, to punish one for speaking any obscene song, ballad or other words, and it must

be deemed unconstitutional as applied here—regulating words abstracted from a theatrical play. To arrest one for speaking words which sound obscene when viewed independent of the play in which they are spoken is an unconstitutional prohibition of what potentially is protected freedom of expression

Further, § 311.6 is aimed at individual obscene words. No proscription whatsoever is made of a play in its entirety, and to apply this statute to a theatrical production as "The Beard" is patently unconstitutional. The same bad faith application of an inapplicable state statute to harass and intimidate plaintiff in pursuit of his constitutionally protected rights as set forth in the discussion of § 647(a) exists here. For the reasons stated in that discussion, Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), as the controlling authority, demands that this federal court intercede.

In summary, I would grant the preliminary injunction, require the defendants to answer and set the cause for trial.