GREGORY, Circuit Judge,
concurring in part and dissenting in part:
The ability to consider and transmit thoughts and ideas through the medium of the written word is an attribute unique to humans. The Universal Declaration of Human Rights provides that freedom of speech is “the highest aspiration of the common people.” Universal Declaration of Human Rights, Dec. 10, 1948, Preamble, G.A. Res. 217A(III), 3 U.N. GAOR Supp. No. 16, U.N. Doc. A/810 (1948). Indeed, “[o]ur whole constitutional heritage rebels at the thought of giving government the power to control men’s minds,” Stanley v. Georgia, 394 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), and simply because “society may find speech offensive is not a sufficient reason for suppressing it.” FCC v. Pacifica Foundation, 438 U.S. 726, 745, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). Because suppression of purely textual emails discussing the child sex fantasies of consenting adults is protected speech, the regulation of which is unsupported by the economic and moral concerns implicated in suppressing child pornography that uses actual children, the application of 18 U.S.C. § 1462 to Whorley violates the First Amendment. Consequently, I would reverse Whorley’s convictions as to counts fifty-six (56) through seventy-five (75). In addition, because the Japanese anime cartoons did not portray actual children, a requirement of 18 U.S.C. § 1466A(a)(1), I would reverse Whorley’s conviction as to counts twenty-one (21) through forty (40). I concur in the majority’s judgment (unless otherwise indicated) as to the remaining issues.
I.
“[Ajlmost every obscenity case involves difficult constitutional issues.” United States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 379, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) (Black, J., dissenting). This case is no exception. Whorley was indicted and convicted, inter alia, for receiving obscene cartoons and receiving and sending obscene e-mails. In the six decades since the Supreme Court first agreed that the federal and state governments could regulate obscene matter, it has struggled to define obscenity. See Miller v. California, 413 U.S. 15, 22, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (“We have seen a variety of views among the members of the Court [on the issue of defining obscenity that is] unmatched in any other course of constitutional adjudication.”) (in *344 ternal quotation marks and citation omitted).
The Supreme Court’s initial foray into the obscenity thicket led to a splintered decision on whether obscenity is protected by the First Amendment. In Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), the majority of the Supreme Court agreed that obscene material cannot find refuge within the First Amendment. The Court defined obscene material as that “which deals with sex in a manner appealing to prurient interest,” id. at 487, 77 S.Ct. 1304, or more specifically, “having a tendency to excite lustful thoughts.” Id. at 488, n. 20, 77 S.Ct. 1304. (1957); see also United States v. Reidel, 402 U.S. 351, 354, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971); but cf. Roth, 354 U.S. at 514, 77 S.Ct. 1304 (Douglas, J., dissenting, joined by Black, J.) (rejecting the majority’s decision to strip the protections of the First Amendment from obscene material because “the test that suppresses a cheap tract today can suppress a literary gem tomorrow” and expressing “the same confidence in the ability of our people to reject noxious literature as [we] have in their capacity to sort out the true from the false in theology, economics, politics, or any other field”).
In Book Named “John Cleland’s Memoirs of a Woman of Pleasure” v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) (plurality opinion), a sharply divided Supreme Court “drastically altered” the Roth obscenity test by requiring the Government to not only prove that the material appealed to the prurient interest and that it was patently offensive, but also “called on the prosecution to prove a negative, i.e., that the material was utterly without redeeming social value — a burden virtually impossible to discharge under our criminal standards of proof.” Miller, 413 U.S. at 22, 93 S.Ct. 2607 (internal quotation marks and citation omitted).
A decade and a half after it first attempted to define obscenity, the Supreme Court candidly admitted that its definition of obscenity “does not reflect the precise meaning of ‘obscene’ as traditionally used in the English language.” Id. at 20, n. 2, 93 S.Ct. 2607. In order to provide relief from the “somewhat tortured history of the Court’s obscenity decisions,” id. at 20, 93 S.Ct. 2607, the Miller court devised a “more concrete,” id., test to aid the finder of fact in identifying obscenity:
(a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.
Id. at 24, 93 S.Ct. 2607 (internal quotation marks and internal citations omitted). This well-intentioned attempt at tethering the task of defining what material is obscene to firmer guideposts did not “extricate [the Supreme Court] from the mire of case-by-case determinations of obscenity,” Jenkins v. Georgia, 418 U.S. 153, 162, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) (Brennan, J., concurring in the result), for courts have continued to engage in an “essentially pointless exercise, in view of the need for an ultimate decision by th[e] [Supreme] Court.” Id. at 163, 94 S.Ct. 2750.
The distinct but related issues of a state’s regulation of obscenity and child pornography were addressed in New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), where the Supreme Court held that the State of New York could ban child pornography that used real *345 children in “live performance or photographic or other visual reproduction of live performances” without impinging upon the First Amendment. Id. at 765, 102 S.Ct. 3348 (emphasis added). Unlike the Miller test for obscenity, the test for child pornography does not require the Government to prove that “the material appeals to the prurient interest of the average person” or that the “sexual conduct portrayed be done so in a patently offensive manner; and the material at issue need not be considered as a whole.” Id. at 764, 102 S.Ct. 3348. The Supreme Court reasoned that the ban on visual depictions of child pornography involving real children did not offend the Constitution because: the “sexual exploitation and abuse of children constitutes a government objective of surpassing importance,” id. at 757, 102 S.Ct. 3348; the distribution of such material “is intrinsically related to the sexual abuse of children,” id. at 759, 102 S.Ct. 3348; the need to circumscribe “the economic motive” of those involved in advertising and selling such materials, id. at 761, 102 S.Ct. 3348; the value of children “engaged in lewd sexual conduct is exceedingly modest, if not de minimis,” id. at 762, 102 S.Ct. 3348 (emphasis in original); and placing child pornography in the “category of material outside the protection of the First Amendment is not, incompatible with our earlier decisions.” Id. at 763, 102 S.Ct. 3348.
The Ferber plurality and several of the concurring justices recognized that the New York statute in question regulated a “tiny fraction,” id. at 773, 102 S.Ct. 3348, of speech that continued to be protected by the First Amendment — e.g., child pornography that has a serious literary, artistic, political, or scientific value. See, e.g., Id. (“[T]he Court of Appeals was understandably concerned that some protected expression ... would fall prey to the statute.”); see also id. at 776, 102 S.Ct. 3348 (Brennan, J., concurring in the judgment, joined by Marshall, J.) (“But in my view application of [the New York statute] or any similar statute to depictions of children that in themselves do have serious literary, artistic, scientific, or medical value, would violate the First Amendment.”). Finally, and most important for our purposes, Justice O’Connor pointed out that while New York’s statute forbid portraying real children in sexual situations, she concluded that the statute “does not attempt to suppress the communication of particular ideas.” Id. at 775, 102 S.Ct. 3348 (O’Connor, J., concurring) (internal quotation marks and citation omitted) (emphasis added).
The Supreme Court extended the reach of Ferber in Osborne v. Ohio, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990), holding that while Stanley continued to protect a person’s right to possess obscenity in the confines of his or her home, child pornography depicting real children would be excepted. The Supreme Court also found that the State of Ohio’s interest in “safeguarding the physical and psychological well-being of a minor is compelling,” Osborne, 495 U.S. at 109, 110 S.Ct. 1691 (internal quotation marks and citation omitted), when contrasted with the “weak interests asserted by the State [of Georgia],” id. at 110, 110 S.Ct. 1691, in Stanley.[1] Thus, Ohio’s statutory prohibition on “possession and viewing of child pornography,” id. at 108, 110 S.Ct. 1691, survived constitutional scrutiny.
Finally, in Ashcroft v. Free Speech Coalition, 535 U.S. 234, 122 S.Ct. 1389, 152 *346 L.Ed.2d 403 (2002), the Supreme Court found two sections of the Child Pornography Prevention Act of 1996 (“CPPA”), 18 U.S.C. § 2251 et seq., to be overbroad because they banned “a significant universe of speech that is neither obscene under Miller nor child pornography under Ferber,” id. at 240, 122 S.Ct. 1389, including sexually explicit images of virtual children. See also id. (“By prohibiting child pornography that does not depict an actual child, the statute goes beyond [Ferber] ....”). The CPPA could be distinguished from the New York statute at issue in Ferber because “[t]he production of the work, not its content, was the target of the [New York] statute.” Id. at 249, 122 S.Ct. 1389. Despite the Government’s contention that child pornography, even without real children, “whets the appetites of pedophiles and encourages them to engage in illegal conduct,” id. at 253, 122 S.Ct. 1389, the Supreme Court held that “[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it.” Id. In striking down portions of the CPPA, the Court was unwilling to go beyond the Ferber/Miller holdings and place all child pornography — including depictions and writings that do not involve the sexual abuse of actual children — beyond the protections of the First Amendment.
The Supreme Court’s attempts to define obscenity for over half a century, including its enunciation of differing standards for obscenity and child pornography, reveal one truth: a material’s obscenity, or lack thereof, ultimately depends on the subjective view of at least five individuals. See U.S. v. 12 200-Foot Reels of Super 8mm. Film, 413 U.S. 123, 137, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973) (Douglas, J., dissenting) (“Moreover, by what right under the Constitution do five of us have to impose our set of values on the literature of the day?”). Predicting how any person subjectively views material is impossible, an infallible truth that prompted Justice Stewart to pronounce a simple, yet honest test for identifying obscenity: “I know it when I see it....” Jacobellis v. State of Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).
On the other hand, in every society, there are fundamental norms of decency and morality that cannot be transgressed if that society is to function in a healthy and productive manner. See Paris Adult Theatre I v. Slaton, 413 U.S. 49, 57-58, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (holding that “the interest of the public in the quality of life and the total community environment and ... possibly, the public safety itself’ is implicated in “stemming the tide of commercialized obscenity”). Allowing children to live in an environment free from the paws of predatory pedophiles is a paramount objective of our society. See Ferber, 458 U.S. at 776, 102 S.Ct. 3348 (Brennan, J., concurring in judgment) (“[T]he State has a special interest in protecting the well-being of its youth.”); see also Paris Adult Theatre I, 413 U.S. at 59-60, 93 S.Ct. 2628 (“[T]here is a right of the Nation and of the States to maintain a decent society.”) (internal quotation marks, ellipsis, and citation omitted).
II.
A.
Here, Whorley argues that 18 U.S.C. § 1462 is facially unconstitutional because it is overbroad, vague, and violates the First Amendment. His arguments must fail. Whorley’s claim that the statute is overbroad and might chill otherwise protected speech, is disconcerting because the locus of Whorley’s activity — i.e., his place of work — played a significant role in the criminalization of his activities. Indeed, *347 excepting the digital pictures of the actual children, Whorley could have possessed hard copies of the cartoons and e-mails in his home without any fear of conviction under § 1462 because the materials only portrayed and discussed fictional children. Nevertheless, because Stanley’s holding is limited to the confines of one’s home, I reject Whorley’s contention that he is entitled to view obscenity in the workplace for the reasons articulated in the majority opinion. (See Maj. Op. 331-33.) And while determining when a person surfing the internet “receives” an image or document is not without its difficulties, a point not lost on the majority (See Maj. Op. 334), I agree that Whorley’s vagueness argument must also fail.
B.
Whorley was indicted under § 1462 for two discrete issues — (1) receiving cartoons depicting fictional children having sex with adults, and (2) exchanging allegedly obscene e-mails discussing his child sex fantasies. Whorley contends that § 1462 is overbroad, vague, and violates the First Amendment, as applied to him.
i.
For the reasons expressed in Section 1(A), Whorley’s as applied constitutional challenge must fail as to the cartoons. While I join the majority’s analysis as to this issue, I wish to add my thoughts on Whorley’s argument that Free Speech Coalition supports his claim that the statute is unconstitutional as applied to him because, inter alia, the children in the cartoons were not real. Whorley’s claim distorts Free Speech Coalition which struck down the CPPA on overbreadth grounds because “[vjirtual child pornography [unlike pornography involving real children] is not ‘intrinsically related’ to the sexual abuse of children.” Free Speech Coalition, 535 U.S. at 250, 122 S.Ct. 1389 (internal citation omitted). As a result, the Supreme Court rejected a complete ban on child pornography that does not involve real children, although such pornography — as with pornography involving adults- — can be found to be obscene. Thus, the jury’s finding that the graphic cartoons of fictional children being raped and sodomized by adults are obscene should not be disturbed because a cartoon does not have to contain actual children in order to be obscene.
ii.
Counts fifty-six (56) to seventy-five (75) charge Whorley with violating § 1462 by using a computer to transmit and receive sexually explicit e-mails with another adult.[2] It is undisputed that Whorley’s counsel failed to raise an issue central to his client’s defense, i.e., that the e-mails were pure speech protected by the First Amendment. While my colleagues have exercised their discretion and chosen not to address this issue, the grave ramifications of the majority’s decision, combined with the fact that the defendant was sentenced to twenty years of imprisonment, compels me to do so.
The Supreme Court, citing to Federal Rule of Criminal Procedure 52(b), has provided guidance for appellate courts when the parties fail to raise an issue of crucial importance. In United States v. Olano, the Court held that “[i]f the forfeited error is plain and affects substantial rights, the court of appeals has authority to order correction.” 507 U.S. 725, 735, 113 S.Ct. *348 1770, 123 L.Ed.2d 508 (1993). As I discuss infra, I believe that the district court erred by not dismissing these charges because the e-mails were clearly pure speech protected by the First Amendment. The error is “obvious,” id. at 734, 113 S.Ct. 1770, because the Supreme Court has never come close to holding that the private fantasies of an adult are not protected by the First Amendment. Unless the Supreme Court chooses to grant certiorari, the majority decision today will chill the expression and innovativeness of private citizens throughout the Fourth Circuit. In addition, this error clearly “prejudiced,” id., Whorley as he was convicted and sentenced based on this error. As a result, there can be no doubt that Whorley’s conviction resulted in a “miscarriage of justice.” Id. at 736, 113 S.Ct. 1770.
The content of the e-mails can be described as “a series of engaging in fantasies on the internet of one person talking about their fantasy, and another asking questions about what they’ve done, what they haven’t done.” (J.A. 155.) The emails did not include any visual depictions or attachments containing child pornography of any type, and the Government does not allege that Whorley used the e-mails to convince or lure a child into any sexual activity. In both Ferber and Osborne, the government’s interest in suppressing the speech in question had “a proximate link to the crime from which it came.” Free Speech Coalition, 535 U.S. at 250, 122 S.Ct. 1389. The Supreme Court was concerned with the potential victims of those crimes, i.e., children, and “[i]t did not suggest that, absent this concern, other governmental interests would suffice.” Id.; see also id. at 250-51, 122 S.Ct. 1389 (“Ferber’s judgment about child pornography was based upon how it was made, not on what it communicated.”). The economic and social justifications for regulating email fantasies — even those involving activities that would be criminal if the fantasies were acted out — are minimal. Indeed, the harm, if any, involved in Whorley’s conduct is not readily discernible because the emails were written and exchanged for the sole “enjoyment” of Whorley and his counterpart. Unlike the facts in Ferber, this exchange of information did not have any economic consequences on the child pornography trade and real children were not harmed (or even discussed) during the “production” of these e-mails.
The majority resolves this issue by citing the well-known proposition that words can be obscene. See, e.g., Kaplan v. California, 413 U.S. 115, 119, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973) (“Obscenity can, of course, manifest itself ... in the written and oral description of conduct. The Court has applied similarly conceived First Amendment standards to moving pictures, to photographs, and to words in books.”) However, simply because words can be obscene is not sufficient, on its own, to criminalize pure speech.
Incest and sexual relationships between children and adults are distasteful subjects to most individuals, yet writers routinely publish such material. In fact, Whorley’s creative writing and English literature expert wrote a dissertation entitled Dipping into Chaos, Incest and Innovation in the Narrative Form in Twentieth Century Literature which explored how “certain authors have used incest as a motif and as a plot element in which they break taboo in order to experiment artistically with language and with the form of a novel.” (J.A. 748.) The expert provided the district court with numerous examples of recognized writings involving child sex with adults and/or incest including: Sigmund Freud’s writings on incest and fantasies, Alice Walker’s The Color Purple, and William Faulkner’s Absalom, Absalom! (described by Oxford University Press *349 (“OUP”) as “one of the leading American novels of the twentieth century,” OUP, http:/¡www. owp. com/us/catalog/general/ subject/LiteratureEnglish/American Literature/20thC//dmlldzl 1 c2EmY2k90Tc b.MDE5NTElNDclpOA= = ?view=usa& ci=978019515k788# Description (last visited June 8, 2008)).
One need not delve into the rare archives of the Library of Congress to find works describing an adult’s sexual fantasies about children. Some of these writings, Lolita for example, are seated at the head table of great literary works of all time. See, e.g., Time.com, All-Time 100 novels, http:// www.time.com/time/2005/100 books/the — complete—UstMml (last visited July 10, 2008). The subject of adults fantasizing about having sex with minors, or alternatively, adults actually consummating relationships with children, is not limited to popular literature and academic discourse. A central theme of the Academy Award winner American Beauty (Dream-Works 1999) is a forty-two year old man’s sexual fantasies about his teenage daughter’s high school classmate.
Comparing Whorley’s writing with recognized literary works and Academy Award winners raises the question of whether his work is within a zone of expression accepted as having artistic value. By utilizing classic literary devices, writers like Nabakov were able to insulate the reader from the disagreeable nature of the subject matter. See, e.g., Amazon.com, Editorial Review of Lolita, http://wim. amazon.com/Lolita-Vladimir-Nabokov/dp/ 0679723161 (last viewed on July 8, 2008) (“Lolita is undoubtedly, brazenly erotic, but the eroticism springs less from the ‘frail honey-hued shoulders ... the silky supple bare back’ of little Lo than it does from the wantonly gorgeous prose that Humbert uses to recount his forbidden passion.”). Distinguishing writings based upon an author’s ability to distract the reader’s instinctual repugnance to a taboo subject by the use of “gorgeous prose” or literary devices is inconsistent with the thrust of the creative writing genre which allows “writers such as Hemingway [to] strip down language, remove symbolism, metaphor, alliteration; all those things to try to get a pure language,” and authentic artistic expression. (J.A. 776.)
From my perspective, the iconic books and movies above render unsustainable the claim that writings describing sexual acts between children and adults, generated by fantasy, have no demonstrated socially redeeming artistic value. If the writers of the aforementioned books and movie scripts e-mailed the sections of their work that described the sexual relationship between the minor and the adult to a willing recipient, presumably both the writer and the recipient could have been subject to prosecution for sending or receiving obscene material under § 1462, an untoward result.
In addition, while published books and finished movie scripts are complete works, such that the fantastical sexual relationship between the child and adult can be analyzed in context, e-mails are rarely comprehensive. Whorley’s correspondence was interrupted and as a result, we have an incomplete picture of the purpose behind the e-mails. It is clear, however, that like the literature and movies cited herein, Whorley’s fantasies “creat[ed] no victims by its production.” Free Speech Coalition, 535 U.S. at 250, 122 S.Ct. 1389.
There is a discernable group of individuals that does “flirt” with child pornography, Free Speech Coalition, 535 U.S. at 245, 122 S.Ct. 1389, though they manage to keep their fantasies pent up. Whorley’s email fantasies, if carried to fruition, would undoubtedly subject him to criminal liabili *350 ty. But just as the “fantasies of a drug addict are his own and beyond the reach of government,” Paris Adult Theatre I, 413 U.S. at 67, 93 S.Ct. 2628, the fantasies of a child pornographer should be as well. With the exception of the crime of conspiracy, the government cannot criminalize the mere communication of ideas. “Freedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action as to be an inseparable part of it,” Roth, 354 U.S. at 514, 77 S.Ct. 1304 (Douglas, J., dissenting); as none of the children discussed in the fantasies exist, Whorley’s actions can easily be separated from the potentially illegal acts about which he fantasized.
Incursions on our citizenry’s right to be free from governmental regulation of speech are viewed with skepticism and scrutiny. See Roth, 354 U.S. at 488, 77 S.Ct. 1304 (“Ceaseless vigilance is the watchword to prevent [the First Amendment’s] erosion by Congress or by the States.”). Whorley’s e-mails are pure speech at the very heart of the First Amendment. “To protect speech for its own sake, the Supreme Court’s First Amendment cases draw vital distinctions between words and deeds, between ideas and conduct.” Free Speech Coalition, 535 U.S. at 253, 122 S.Ct. 1389 (citations omitted); see also, Young v. American Mini Theatres, Inc., 427 U.S. 50, 66, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (“The question whether speech is, or is not protected by the First Amendment often depends on the content of the speech.”). The textual e-mails expressed Whorley’s and his adult counterpart’s fantastical desires to engage in sexual relations with children. Despite the repugnant nature of such ideas, “[a]ll ideas having even the slightest redeeming social importance — unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion — have the full protection of the [First Amendment], unless excludable because they encroach upon the limited area of more important interests.” Roth, 354 U.S. at 484, 77 S.Ct. 1304. Frankly, I am hard pressed to find a permissible governmental interest that is served in suppressing Whorley’s e-mails as such an action would not aid in “protecting] the victims of child pornography” or the “destruction] [of] a market for the exploitative use of children.” Osborne, 495 U.S. at 109, 110 S.Ct. 1691. The most obvious interest the government might have in suppressing such speech — that such fantasies may “whet[] the appetites of pedophiles and encourage[ ] them to engage in illegal conduct,” Ashcroft, 535 U.S. at 253, 122 S.Ct. 1389, has been soundly rejected by the Supreme Court.
Therefore, I find that this statute, as applied to Whorley, criminalizes protected speech and “is a stark example of speech suppression,” Free Speech Coalition, 535 U.S. at 244, 122 S.Ct. 1389. Consequently, I would reverse his convictions as to counts fifty-six (56) to seventy-five (75) on the basis that the conviction was plainly erroneous because the defendant’s e-mail fantasies are a form of pure speech protected by the Constitution and not within the reach of 18 U.S.C. § 1462.
III.
Whorley contends that 18 U.S.C. § 1466A(a)(l)[3] of the PROTECT Act of *351 2003, as applied to him, is unconstitutional because it requires an actual minor child and not a fictional character. My colleagues in the majority disagree, holding that the “clear language” of the statute is “sufficiently broad to prohibit receipt of obscene cartoons.” (Maj.Op. 336) Although I do not find that the statute is constitutionally infirm, I interpret subsection (a)(1) to only criminalize material, including cartoons and drawings, that incorporates actual children, even if those children cannot be conclusively identified. Because it is undisputed that real children are not included in the Japanese Anime cartoons Whorley received, I would reverse Whorle/s conviction as to counts twenty-one (21) through forty (40).
A straightforward reading of the statute reveals that subsection (a)(1) requires receipt of a pornographic article depicting an actual minor “engaging in sexually explicit conduct” for an individual to be ensnared within its web. Stressing that the phrase “sexually explicit conduct” includes “persons of the same or opposite sex” (Maj. Op. 336 (quoting 18 U.S.C. § 2256) (emphasis in original)), the majority apparently believes that a “person” includes both real and fictitious children. I disagree. First, 18 U.S.C. § 2232 defines minor as “any person under the age of eighteen years.” A person is defined as a “living human being” and “a human being ... with legal rights and duties.” Webster’s II New Riverside University Dictionary 877 (1994); see also, Black’s Law Dictionary 1178 (8th ed.2004) (defining “person” as synonymous with “natural person”). A child that is a figment of an illustrator’s imagination is not living, is not a human being with legal rights, and is certainly not natural in the legal sense of the word. See Black’s Law Dictionary 1178 (8th ed.2004) (defining “natural” as “brought about by nature as opposed to artificial means”). Thus, for example, the conviction of an individual for receiving a sexually explicit obscene caricature of an actual person under the age of eighteen years would be appropriate under this statute.
Second, the majority concludes that Whorley “overlooks” 18 U.S.C. § 1466A(c) which provides that the Government does not have to prove that “the minor depicted” in the cartoons “actually exist[s].” The intent of subsection (c) is to relax the evidentiary requirements necessary to find an individual guilty under this statute, thus relieving the Government from the burden of exhaustively searching the country to identify conclusively the children involved in the production of the child pornography. See Senate Report No. 108-2 at *5 (February 11, 2003) (“[Pjrosecutors typically are unable to identify the children depicted in child pornography. Not surprisingly, these children are abused and victimized in anonymity, even when the child pornography is produced within the United States.”).[4]
Third, a comparison of the elements contained in subsections §§ 1466A(a)(l) and (a)(2) reveal that the only way to avoid making subsection (a)(2) superfluous is to assume that Congress only required a real child in subsection (a)(1). For example, subsection (a)(1) only requires “sexually explicit conduct,”[5] which includes the *352 broad category of “lascivious exhibition of the genitals or pubic areas” of a child; subsection (a)(2), on the other hand, criminalizes a more limited type of conduct— i.e., “graphic bestiality, sadistic or masochistic abuse, or sexual intercourse.” Thus, the standard under subsection (a)(1) is less demanding, presumably because the conduct involves the abuse of real minors.
For these reasons, I would find that § 1466A(a)(l) is not applicable to Whoriey, and reverse his convictions as to counts twenty-one (21) through forty (40).
IV.
The majority rejects Whorley’s contention that the district court abused its discretion by not including a more detailed definition of “as a whole” when instructing the jury on the Miller obscenity test. Because an instruction placing the Miller formula in the context of the internet would have been useful to the jury in this case, Whorley’s objection merits further discussion.
Whoriey asked the district court to emphasize, with respect to the third part of the Miller test, that “as a whole” meant the “entire work, book, movie, magazine, or story from which the matter in question is derived. Taking a single picture or group of pictures from a body of work does not constitute the whole of the work, just as a single passage from a book or story does not constitute the whole book or story.” (J.A. 218K.) The district court rejected Whorley’s suggestion because the jury could use its “own common sense and logic in determining what the word as a whole means.” (J.A. 794.)
Under our Circuit precedent:
A district court’s refusal to provide an instruction requested by a defendant constitutes reversible error only if the instruction: (1) was correct; (2) was not substantially covered by the court’s charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant’s ability to conduct his defense.
United States v. Lewis, 53 F.3d 29, 32-33 (4th Cir.1995) (internal quotation marks and citations omitted). Whorley’s additional instruction is consistent with the law, although under most circumstances, the typical regurgitation of the Miller standard is sufficient to convey to the jury that it must consider the specific material at issue in the context of the entire work from which it came. However, when dealing with a medium — the web — that is still not used by one-fifth of the U.S. population, see, e.g., Reuters.com, Poll finds nearly 80% of U.S. adults go online, http:// www. reuters. com/article/ intemetNews/id USN0559828Í20071106ffeedType =RSS & feedName= intemetNews & sp=true (last viewed on June 30, 2008), Whorley’s general contention that the district court should have provided more guidance on this matter warrants attention. Indeed, it is reasonable to ask whether a district court should assume that all the jurors understood, for example, the difference between a webpage (one part of a website) and a website. This is particularly true in this case where the forensic evidence was hardly definitive. Nevertheless, since Whor-ley’s requested instruction did not address the internet, I agree that the instructions “substantially covered” Whorley’s request *353 ed instruction, and as a result, it did not impair his ability to conduct his defense.
V.
Because I would reverse Whorley’s conviction as to counts twenty-one (21) through forty (40), and counts fifty-six (56) through seventy-five (75), I would remand the case to the district court to review its sentence. It is true that the sentences for counts fifty-six (56) through seventy-five (75) ran concurrent to counts one (1) through twenty (20), and the sentence for counts twenty-one (21) through forty (40) ran concurrent to the sentence for counts forty-two (42) through fifty-five (55), but the reversal of forty counts is a significant event that would require the district court to determine whether the overall sentence, and in particular, the upward departure, was appropriate.
VI.
Today, under the guise of suppressing obscenity — whatever meaning that term may encompass — we have provided the government with the power to roll back our previously inviolable right to use our imaginations to create fantasies. It is precisely this unencumbered ability to fantasize that has allowed this nation to reap the benefits of great literary insight and scientific invention. The Constitution’s inviolable promise to us is its guarantee to defend thought, imagination and fantasy from unlawful governmental interference regardless of whether such thoughts, imaginings, or fantasies are popular with the masses. It is in these moments that our grip on the rule of law and our fidelity to constitutional values is tested.
Thus, with all due respect to my colleagues, I dissent from the majority’s affir-mance of Whorley’s convictions as to counts twenty-one (21) through forty (40), and counts fifty-six (56) through seventy-five (75) and concur in the majority’s judgment affirming Whorley’s convictions as to the remaining counts.

. "In Stanley, Georgia primarily sought to proscribe the private possession of obscenity because it was concerned that obscenity would poison the minds of its viewers.” Osborne, 495 U.S. at 109, 110 S.Ct. 1691 (citation omitted).

. “E-mail enables an individual to send an electronic message — generally akin to a note or letter — to another individual....” Reno v. American Civil Liberties Union, 521 U.S. 844, 851, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

. (a) In general — Any person who, in a circumstance described in subsection (d), knowingly produces, distributes, receives, or possesses with intent to distribute, a visual depiction of any kind, including a drawing, cartoon, sculpture, or painting, that—
(1)(A) depicts a minor engaging in sexually explicit conduct; and
(B) is obscene;
A(b)(l), including the penalties provided for cases involving a prior conviction.

. Under subsection (c), the fact that a child did not "actually exist” — i.e., he or she had passed away — would not impede the prosecution of an individual under this statute.

. 18 U.S.C. § 2256 defines “sexually explicit conduct” as:
(i) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited;
*352 (ii) graphic or lascivious simulated;
(I) bestiality;
(II) masturbation; or
(III) sadistic or masochistic abuse; or
(iii) graphic or simulated lascivious exhibition of the genitals or pubic area of any person.